**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In re Winter Storm Uri Natural Gas Litigation | Case No. 6:24-cv-01073-DDC-ADM |
| | **This Document Relates to All Cases** |

**DEFENDANTS' JOINT MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS**

# TABLE OF CONTENTS

*Page*

INTRODUCTION ................................................................................................................1

BACKGROUND ..................................................................................................................5

    A.    The Parties .....................................................................................................5

    B.    Natural-Gas Prices and S&P Global Platts .................................................6

    C.    Winter Storm Uri ..........................................................................................7

    D.    The Complaints ............................................................................................10

LEGAL STANDARD .........................................................................................................11

ARGUMENT ......................................................................................................................11

I.    Plaintiffs Do Not Allege Any "Consumer Transaction" That Could Support a KCPA Claim Against Defendants ........................................................................11

    A.    Plaintiffs Do Not Allege That They Were Parties to the Challenged Wholesale Transactions .................................................................................11

    B.    Plaintiffs Do Not Allege Any Conduct by Defendants "in Connection with" a Consumer Transaction Involving Plaintiffs ...............................16

II.    Defendants Are Not "Suppliers" Under the KCPA Because Plaintiffs Do Not Allege That Defendants Solicit, Engage in, or Enforce Consumer Transactions in the Ordinary Course of Business ......................................................................19

III.    Plaintiffs Do Not Allege That They Have Suffered a Loss Proximately Caused by Defendants' Wholesale Transactions....................................................................21

IV.    Plaintiffs Do Not Allege That Any Defendant Engaged in an Unconscionable Act ........24

V.    Plaintiffs' Claims Are Preempted by Federal Law .........................................................26

VI.    Plaintiffs' Claims in *Mehl*, *Rebein*, and *Rice* Are Barred by the Filed-Rate Doctrine Because the KCC Has Primary Jurisdiction to Determine the Reasonableness of Retail Natural-Gas Rates in Kansas .................................................32

VII.    Plaintiffs' Claims in *Rice* Relate to Transactions Even Further Upstream.......................38

CONCLUSION....................................................................................................................39

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Alexander v. Certified Master Builders Corp.*,
    268 Kan. 812, 1 P.3d 899 (2000) ............................................................................19

*Amundson & Assocs. Art Studio, Ltd. v. Nat'l Council on Comp. Ins., Inc.*,
    26 Kan. App. 2d 489, 988 P.2d 1208 (1999) ...................................................33, 35

*Anderson v. Barclay's Cap. Real Est., Inc.*,
    989 N.E.2d 997 (Ohio 2013).................................................................................19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).............................................................................................24

*Benedict v. Altria Grp., Inc.*,
    241 F.R.D. 668 (D. Kan. 2007).............................................................................21

*Berry v. Nat'l Med. Servs., Inc.*,
    41 Kan. App. 2d 612, 205 P.3d 745 (2009) ...................................................12, 14

*Burton v. R.J. Reynolds Tobacco Co.*,
    884 F. Supp. 1515 (D. Kan. 1995).........................................................................23

*City of Mulberry v. BP Energy Co.*,
    No. 2021-CV-000031 (Kan. Dist. Ct. Feb. 9, 2022)..............................................15

*Cole v. Hewlett Packard Co.*,
    2004 WL 376471 (Kan. Ct. App. Feb. 27, 2004) ...........................................17, 20

*Colo. Dep't of Pub. Health v. United States*,
    693 F.3d 1214 (10th Cir. 2012) ............................................................................26

*Dana v. Heartland Mgmt. Co.*,
    48 Kan. App. 2d 1048, 301 P.3d 772 (2013) ........................................................25

*Danisco Ingredients USA, Inc. v. Kan. City Power & Light Co.*,
    267 Kan. 760, 986 P.2d 377 (1999).........................................................32, 34, 35

*Ellibee v. Aramark Corr. Servs., Inc.*,
    37 Kan. App. 2d 430, 154 P.3d 39 (2007) ......................................................13, 14

*Ellis v. Chase Bank USA, NA*,
    2017 WL 5158311 (D. Kan. Nov. 7, 2017) ...........................................................11

*Entergy Corp. v. Jenkins*,
469 S.W.3d 330 (Tex. Ct. App. 2015) ..................................................................29

*Farmer v. Kan. State Univ.*,
2017 WL 980460 (D. Kan. Mar. 14, 2017) ............................................................23

*Farmland Indus., Inc. v. Kan. Corp. Comm'n*,
29 Kan. App. 2d 1031, 37 P.3d 640 (2001) ..........................................................32

*Fax Telecommunicaciones v. AT&T*,
952 F. Supp. 946 (E.D.N.Y. 1996) ........................................................................35

*Federal Power Comm'n v. Sierra Pac. Power Co.*,
350 U.S. 348 (1956).............................................................................................29

*Finstad v. Washburn Univ.*,
252 Kan. 465, 845 P.2d 685 (1993) ......................................................................21

*FTC v. Affiliate Strategies, Inc.*,
2010 WL 11470099 (D. Kan. June 4, 2010)...........................................................23

*Grindsted Prod., Inc. v. Kan. Corp. Comm'n*,
262 Kan. 294, 937 P.2d 1 (1997) ..............................................................34, 35, 36

*Hahn v. Doe*,
1995 WL 127863 (Ohio Ct. App. Mar. 23, 1995) ..........................................16, 17

*Hayes v. Find Track & Locate, Inc.*,
60 F. Supp. 3d 1144 (D. Kan. 2014)..............................................................13, 14

*Hill v. BellSouth Telecomm., Inc.*,
364 F.3d 1308 (11th Cir. 2004) ............................................................................34

*Hills v. Arensdorf*,
543 F. Supp. 3d 1065 (D. Kan. 2021)....................................................................23

*Holman v. Fifth Third Bank, N.A.*,
2021 WL 5578549 (D. Kan. Nov. 30, 2021) ...............................................3, 4, 23

*Hughes v. Talen Energy Mktg., LLC*,
578 U.S. 150 (2016)...............................................................................................28

*Jacobsen v. Deseret Book Co.*,
287 F.3d 936 (10th Cir. 2002) ................................................................................9

*Jones v. Google LLC, Inc.*,
2020 WL 1862575 (D. Kan. Apr. 14, 2020)...........................................................23

*Kan. Elec. Power Co. v. Thomas*,
    123 Kan. 321, 255 P. 33 (1927) ........................................................................33

*Kan. Gas & Elec. Co. v. Kan. Corp. Comm'n*,
    239 Kan. 483, 720 P.2d 1063 (1986) ................................................................34

*Kan. Pipeline Co. v. Kan. Corp. Comm'n*,
    2002 WL 1398540 (D. Kan. June 24, 2002).................................................34, 35

*Kastner v. Intrust Bank*,
    2011 WL 2149432 (D. Kan. June 1, 2011)...................................................12, 13

*Kestrel Holdings I, L.L.C. v. Learjet Inc.*,
    316 F. Supp. 2d 1071 (D. Kan. 2004) ...............................................................14

*Knight v. Mooring Cap. Fund, LLC*,
    749 F.3d 1180 (10th Cir. 2014) ........................................................................11

*Krause v. Nationstar Mortg., LLC*,
    2015 WL 4041662 (D. Kan. July 1, 2015) .........................................................13

*Lamb v. Daimler Truck N. Am. LLC*,
    2023 WL 2967918 (D. Kan. Apr. 17, 2023) .......................................................23

*Lester v. Wow Car Co.*,
    2014 WL 2567087 (S.D. Ohio June 6, 2014) .....................................................16

*Luttrell v. Brannon*,
    2018 WL 3032993 (D. Kan. June 19, 2018)........................................................14

*Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*,
    497 U.S. 116 (1990)...........................................................................................35

*In re Meis*,
    2011 WL 6148654 (Bankr. D. Kan. Dec. 9, 2011)........................................11, 33

*Mississippi Power & Light Co. v. Mississippi ex rel. Moore*,
    487 U.S. 354 (1988).............................................................................28, 29, 30

*Nantahala Power & Light Co. v. Thornburg*,
    476 U.S. 953 (1986)...........................................................................................28

*NRG Power Mktg., LLC v. Maine Pub. Utilities Comm'n*,
    558 U.S. 165 (2010)...........................................................................................29

*ONEOK, Inc. v. Learjet, Inc.*,
    575 U.S. 373 (2015)....................................................................................27, 30

*Panhandle E. Pipeline Co. v. Oklahoma*,
   83 F.3d 1219 (10th Cir. 1996) ...............................................................................29

*Pay Phone Concepts, Inc. v. MCI Telecommunications Corp.*,
   904 F. Supp. 1202 (D. Kan. 1995) ...................................................................33, 36

*Phillips Pipe Line Co. v. Diamond Shamrock Ref. & Mktg. Co.*,
   50 F.3d 864 (10th Cir. 1995) .................................................................................31

*Pinkney v. TBC Corp.*,
   2020 WL 1528544 (D. Kan. Mar. 31, 2020) .........................................................23

*Price v. Lambert Ford, Inc.*,
   1992 WL 103746 (Ohio Ct. App. May 13, 1992)....................................16, 17, 28

*Purcell v. N.Y. Cent. R. Co.*,
   197 N.E. 182 (N.Y. 1935)......................................................................................35

*Schneider v. Liberty Asset Mgmt.*,
   45 Kan. App. 2d 978, 251 P.3d 666 (2011) .....................................................21, 23

*Schneider v. U.S. Bank, N.A.*,
   2020 WL 4673159 (D. Kan. Aug. 12, 2020) .........................................................24

*Shigo v. Clark*,
   2022 WL 2966320 (D. Kan. July 27, 2022) ..........................................................24

*Smith v. United States*,
   561 F.3d 1090 (10th Cir. 2009) ...............................................................................9

*State v. Dooley*,
   308 Kan. 641, 423 P.3d 469 (2018) .......................................................................19

*Sullivan v. Hartford Fin. Servs. Grp., Inc.*,
   2023 WL 4635888 (10th Cir. July 20, 2023)..........................................................24

*Sunflower Pipeline Co. v. State Corp. Comm'n*,
   5 Kan. App. 2d 715, 624 P.2d 466 (1981) .................................................32, 33, 34

*SWKI-Seward W. Cent., Inc. v. Kan. Corp. Comm'n*,
   2018 WL 385692 (Kan. Ct. App. Jan. 12, 2018) ................................................4, 31

*Tomes v. LoanCare, LLC*,
   2023 WL 3995665 (D. Kan. June 14, 2023).............................................................24

*United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*,
   350 U.S. 332 (1956)................................................................................................29

*In re Universal Serv. Fund Tel. Billing Practice Litig.*,
   619 F.3d 1188 (10th Cir. 2010) ...........................................................26

*Weckhorst v. Kan. State Univ.*,
   241 F. Supp. 3d 1154 (D. Kan. 2017) ...................................................10

*Wegoland Ltd. v. NYNEX Corp.*,
   27 F.3d 17 (2d Cir. 1994) .....................................................................33

*Wright v. Enhanced Recovery Co.*,
   227 F. Supp. 3d 1207 (D. Kan. 2016) ...................................................11

**Statutes**

15 U.S.C. § 717 .........................................................................................4, 28

15 U.S.C. § 717c-1 .........................................................................................28

15 U.S.C. § 717d ...............................................................................4, 28, 30

K.S.A. § 50-6,106 .....................................................................10, 12, 25, 26

K.S.A. § 50-624 .................................................................................... *passim*

K.S.A. § 50-627 .................................................................................... *passim*

K.S.A. § 50-634 .............................................................................................21

Ohio Rev. Code § 1345.01 .............................................................................20

Ohio Rev. Code § 1345.03 .............................................................................16

**Other Authorities**

18 C.F.R. § 284.402 .......................................................................................29

57 Fed. Reg. 13,267-02 (1992) .....................................................................27

62 F.E.R.C. ¶ 61,007 (1993) .........................................................................28

64 Am. Jur. 2d *Public Utilities* § 52 (May 2024) .......................................34

*Engage*, Black's Law Dictionary (11th ed. 2019) ......................................19

III FERC Stats. & Regs. ¶ 30,939 (Apr. 8, 1992) ........................................28

*Solicitation*, Black's Law Dictionary (11th ed. 2019) ................................19

Defendants BP Energy Company; BP Canada Energy Marketing Corp.; CIMA ENERGY, LP (formerly CIMA ENERGY, LTD.); Concord Energy LLC; ETC Marketing, Ltd.; Macquarie Energy LLC; Mercuria Energy America, Inc.; NextEra Energy Marketing, LLC; Rockpoint Gas Storage, LLC; Southwest Energy L.P.; Spotlight Energy, LLC; Tenaska Marketing Ventures; and Williams Energy Resources LLC respectfully submit this joint memorandum of law in support of their motion to dismiss in their entirety the operative complaints in each of the five consolidated class actions (together, the "Complaints") under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

## INTRODUCTION

Plaintiffs in these five consolidated actions are individual Kansas residents who bought natural gas provided from five different distributors (the "Distributors") that serve municipal entities or retail customers in Kansas.  Plaintiffs do not allege that they had any transactions with Defendants.  Instead, their only allegedly relevant transactions were with the nonparty Distributors.  Plaintiffs argue that they will be overcharged by the Distributors or their local municipalities for natural gas delivered in February 2021 during a severe winter storm known as Winter Storm Uri.  Rather than predicate their claims on their transactions with the five Distributors, Plaintiffs seek to use the Kansas Consumer Protection Act ("KCPA"), K.S.A. § 50-623 *et seq*., to challenge the prices charged in separate wholesale transactions between Defendants and the Distributors (or their suppliers) upstream from Plaintiffs' retail purchases.  Plaintiffs allege no collusion, no false statements, no misleading advertising, and no unequal bargaining power.  Although they acknowledge that the floating index prices the Distributors or their suppliers paid for wholesale natural gas were high across the entire region because of the historic storm and its effect on gas supply and demand, Plaintiffs nevertheless assert that these market-wide index prices were unconscionable under the KCPA.

Even though they seek to assert claims under a consumer-protection statute, Plaintiffs do not allege that they entered into a consumer transaction with any Defendant to buy natural gas or that they had any contact at all with Defendants.  Plaintiffs instead admit that they purchased natural gas either from the Distributors or from municipal entities that bought the gas from the Distributors.  The Distributors or their suppliers, in turn, purchased the gas from Defendants in separate wholesale transactions in which Plaintiffs had no involvement.  Plaintiffs' attempt to use the KCPA to challenge the prices that these sophisticated commercial entities agreed to pay in arm's-length, federally regulated, wholesale transactions with Defendants fails as a matter of law for multiple reasons.

*First*, the KCPA is a consumer-protection law that applies only to "consumer transactions." K.S.A. § 50-627(a).  It does not apply to wholesale transactions between sophisticated commercial counterparties.  Plaintiffs have not identified *any* consumer transactions involving Defendants. Instead, they seek to challenge under the KCPA the wholesale prices the Distributors or their suppliers paid to Defendants in separate commercial transactions in which Plaintiffs played no role.  Plaintiffs also do not plead that any Defendant engaged in an unconscionable act "in connection with" Plaintiffs' downstream purchases of natural gas from the Distributors or local municipalities. K.S.A. § 50-627(a).  Because Plaintiffs do not (and cannot) allege that they entered into a "consumer transaction" with Defendants—or that they had any contact at all with a Defendant—their KCPA claims against Defendants fail as a matter of law.

*Second*, Defendants do not even qualify as "suppliers" that can be sued under the KCPA. The KCPA defines a "supplier" as a seller that "in the ordinary course of business, solicits, engages in or enforces consumer transactions." K.S.A. § 50-624(l).  Plaintiffs do not allege that Defendants do any of those things in the ordinary course of business.  Nowhere in any of the Complaints do

Plaintiffs allege that any Defendant in the ordinary course of business sells natural gas to consumers, advertises natural gas to consumers, or makes any representations to consumers. Rather, Plaintiffs allege that Defendants sell a commodity product, natural gas, to commercial intermediaries in arm's-length wholesale transactions that are entirely separate from the Distributors' downstream resale of the gas to consumers.

*Third*, even if Plaintiffs could satisfy these threshold requirements under the KCPA, they do not adequately allege that Defendants' purported KCPA violations proximately caused their damages. Plaintiffs' claims are based on alleged charges they later incurred on their monthly utility bills as a result of numerous, independent decisions of other entities, including the State of Kansas, the Kansas Corporation Commission ("KCC"), various Kansas municipalities, and the Distributors themselves. *Stoneberger* ¶¶ 60-66; *Mehl* ¶¶ 70-78; *Rebein* ¶¶ 61-65; *Rice* ¶¶ 66-72; *Deutscher* ¶¶ 47-49. These third-party decisions are intervening causes that break the causal chain connecting Plaintiffs' alleged injuries to Defendants' wholesale transactions as matter of law. To the extent Plaintiffs have suffered any damages based on the charges the Distributors or their local municipalities added to their monthly utility bills long after Winter Storm Uri, Plaintiffs cannot show that those damages were proximately caused by Defendants' wholesale prices and transactions.

*Fourth*, the Complaints fail to plead that any of the Defendants engaged in unconscionable acts under the KCPA. Plaintiffs admit that the challenged wholesale transactions in February 2021 were priced according to daily index prices determined and published by an independent third party, S&P Global Platts ("Platts"), based on its survey of natural-gas trades at the relevant trading locations. *See Stoneberger* ¶¶ 17, 25, 29; *Mehl* ¶¶ 19, 27, 32; *Rebein* ¶¶ 18, 26, 27; *Rice* ¶¶ 19, 29, 32; *Deutscher* ¶¶ 15, 22, 23. Defendants did not engage in an unconscionable act under the KCPA

by entering into arm's-length wholesale transactions with sophisticated, commercial counterparties to sell natural gas at floating index prices determined by an independent third party.

*Fifth*, Plaintiffs' claims are preempted by federal law because they directly challenge the wholesale prices that Defendants charged for natural gas.  Federal law gives the Federal Energy Regulatory Commission ("FERC") exclusive authority to determine whether the rates charged by any seller of natural gas in wholesale transactions are unjust or unreasonable.  15 U.S.C. §§ 717(b), 717d(a).  Under FERC's regulations, all wholesale sales of natural gas by companies other than interstate natural-gas pipelines are deemed to be just and reasonable unless FERC determines otherwise.  In asking this Court to find that the wholesale prices Defendants charged for natural gas were too high under a state consumer-protection statute, Plaintiffs' claims conflict with FERC's authority to determine the reasonableness of wholesale prices and thus are preempted.

*Sixth*, the *Mehl*, *Rice,* and *Rebein* Plaintiffs' claims are barred by the filed-rate doctrine, which grants the KCC exclusive jurisdiction to regulate public utilities in Kansas.  The KCC reviewed the costs the relevant Distributors incurred during Winter Storm Uri and approved settlement agreements with those Distributors that allow for allocation of a percentage of those costs to Plaintiffs and other gas users over time.  *Mehl* ¶¶ 72-76; *Rebein* ¶¶ 62-64; *Rice* ¶¶ 67-68.  Under the filed-rate doctrine, "courts lack authority to impose or enforce a different rate than that approved by the regulatory agency because the agency possesses primary jurisdiction to resolve such issues."  *SWKI-Seward W. Cent., Inc. v. Kan. Corp. Comm'n*, 2018 WL 385692, at *9 (Kan. Ct. App. Jan. 12, 2018).  If successful, Plaintiffs' claims in *Mehl*, *Rice,* and *Rebein* would usurp the KCC's primary jurisdiction to determine the reasonableness of retail prices charged for natural gas to consumers in Kansas.

*Seventh*, the *Rice* Plaintiffs' claims further fail because they do not allege that most of the Defendants in that action sold natural gas directly to the relevant Distributor, Atmos Energy Corporation ("Atmos"), or even that their gas ever reached the putative class members.  The Complaint in *Rice* instead principally alleges that Defendants sold natural gas to nonparty wholesaler Symmetry, which in turn sold a minority of its gas to Atmos but not necessarily the gas Symmetry purchased from Defendants.  These tenuous allegations cannot support a claim under the KCPA.

## BACKGROUND

### A.    The Parties

Defendants sell natural gas in interstate commerce through wholesale transactions. *Stoneberger* ¶¶ 10-13; *Mehl* ¶¶ 10-15; *Rebein* ¶¶ 9-14; *Rice* ¶¶ 8-15; *Deutscher* ¶¶ 10-11.  None of the Defendants are alleged to have sold or marketed natural gas directly to Plaintiffs or any other consumer.  Instead, Plaintiffs allege that Defendants sold gas (directly or indirectly) to one of five nonparty Distributors in separate wholesale transactions at supposedly "unconscionable prices" in February 2021 during Winter Storm Uri.  *Stoneberger* ¶¶ 27, 29-33; *Mehl* ¶¶ 28-29, 34-39; *Rebein* ¶¶ 27-28, 54-60; *Deutscher* ¶¶ 23-24; *Rice* ¶¶ 30-33, 73-74, 78-84.[1]

The five nonparty Distributors are not themselves consumers under the KCPA.  They are instead large and sophisticated companies that buy natural gas in the wholesale market and collectively serve a substantial portion of the State of Kansas.  The five Distributors whose wholesale natural-gas purchases from Defendants are the subject of Plaintiffs' claims are:

---

[1] For their part, the *Rice* Plaintiffs assert that most of the Defendants in that action sold gas to a nonparty wholesaler one step removed from the relevant Distributor and that the wholesaler may (or may not) have resold that gas to the Distributor.  *Rice* ¶¶ 8-15.

- Kansas Gas Service ("KGS"), which is "the largest natural gas distributor in Kansas," *Mehl* ¶ 29;

- Kansas Municipal Gas Agency ("KMGA"), which is "a non-profit, interlocal public agency that purchases, schedules, and manages natural-gas supply for more than 30 cities in Kansas,"[2] *Stoneberger* ¶ 27;

- Black Hills/Kansas Gas Utility Company, LLC ("Black Hills"), which "distributed natural gas to 113,511 customers in Kansas" in February 2021, *Rebein* ¶ 28;

- Atmos Energy Corporation ("Atmos"), which "distribut[ed] natural gas to a customer base in Kansas that included 125,000 Kansas residential customers" as of September 2021, *Rice* ¶ 31; and

- Midwest Energy, Inc. ("Midwest Energy"), which is an "an electric and natural-gas cooperative that serves approximately 93,000 customers throughout 40 counties in central and western Kansas," *Deutscher* ¶ 24.

Plaintiffs are residents of Kansas "whose utilities were served by" the five Distributors. *Stoneberger* ¶ 67; *Mehl* ¶ 83; *Rebein* ¶ 69; *Rice* ¶ 85; *Deutscher* ¶ 50. The Complaints do not allege that any Plaintiff had a relationship—contractual or otherwise—with any Defendant, much less that any Plaintiff bought natural gas from a Defendant or received any advertisements or solicitations for natural gas from a Defendant at any time. Nor do the Complaints allege that Plaintiffs had any role in Defendants' separate wholesale transactions with their commercial counterparties.

**B.    Natural-Gas Prices and S&P Global Platts**

In wholesale transactions, buyers and sellers of natural gas often agree to floating prices based on market-wide indexes determined and published by Platts, the leading independent provider of information and benchmark prices for the commodities and energy markets, including the natural-gas market. *See Stoneberger* ¶ 17. For natural gas, Platts "collects data on natural-gas

---

[2] Although KMGA is referred to as a Distributor for purposes of this motion to dismiss, KMGA is not a utility like the other Distributors. KMGA purchases gas in wholesale transactions and sells that gas to municipal utilities, which in turn sell gas to retail customers. Accordingly, in *Stoneberger*, Plaintiffs are separated from the transactions they seek to challenge by two layers of distributors and resellers— both their municipal utilities and KMGA.

trades and publishes both daily and monthly price indexes for various trading locations." *Id.* When buyers like the Distributors enter into contracts for "deliver[y of] a specific volume of natural gas in advance at a set price," they will often agree to a price tied to a monthly index price, which is based on "a volume-weighted average of all transactions submitted to Platts" during the three designated trading days at the end of the previous month. *Deutscher* ¶ 18. And when buyers need additional gas beyond what they had planned for in advance, they typically buy gas for next-day delivery in the spot market at the daily index price set by Platts, *i.e.*, "the prevailing market rate at the time of purchase." *Id.* ¶ 19. Some buyers, like the Distributors, may also agree in advance to deals that give them the option to call additional deliveries of natural gas on particular days priced at Platts' daily index price. *See Mehl* ¶ 23; *Stoneberger* ¶ 21; *Rebein* ¶ 22; *Rice* ¶ 23.

### C.     Winter Storm Uri

In February 2021, Winter Storm Uri swept through the entire region, including Kansas, and profoundly disrupted its energy markets. *Stoneberger* ¶¶ 35-36. As temperatures "started to deviate substantially from their historical averages" leading up to the storm, the spot prices for natural gas on a number of pipelines began to rise, and these spot prices rose even higher after the storm struck the region with unprecedented winter weather. *Id.* ¶¶ 36, 38-39. The storm's "'[l]ow temperatures with sub-zero wind chills … accompanied by snow, sleet, and freezing rain across the state … caused stress on energy infrastructure,'" decreasing natural-gas supply while cold weather drastically increased demand for gas. *Id.* ¶ 42; *see also Mehl* ¶¶ 41-42, 44-45, 48; *Rebein* ¶¶ 31-32, 34-36; *Rice* ¶¶ 37-38, 40-41, 44; *Deutscher* ¶¶ 28-29, 31-32, 34.

On Sunday, February 14, 2021, Governor Laura Kelly declared a state of emergency in Kansas due to "stress on the energy infrastructure." *Stoneberger* ¶ 42. As a result of this declaration, the KCC—which oversees certain intrastate natural-gas sales—ordered all natural-gas utilities under its jurisdiction (including certain of the Distributors) "to do all things possible and

necessary to ensure natural gas … services continue to be provided to their customers in the State." *Id.* ¶ 43 (omission in original).  In response to this order, "natural-gas distributors in Kansas made substantial purchases of natural gas at the prevailing spot price to ensure their storages of natural gas would not run low."  *Id.* ¶ 44; *see also Mehl* ¶¶ 48-50; *Rebein* ¶¶ 36-38; *Rice* ¶¶ 44-46; *Deutscher* ¶¶ 34-36.

As these events unfolded, the wholesale price of natural gas in Kansas rose dramatically. Plaintiffs' allegations show that these increases in price were not limited to specific sellers or specific transactions.  The storm instead affected the entire wholesale market in Kansas and elsewhere.  Plaintiffs allege that the Distributors purchased natural gas from Defendants at prices based on eleven different daily indexes published by Platts, all of which experienced extreme increases during Winter Storm Uri affecting prices across various states, as shown in the table below.  *Stoneberger* ¶ 25; *Mehl* ¶ 27; *Rebein* ¶ 26; *Rice* ¶ 29; *Deutscher* ¶ 22.[3]

| Index | Feb. 9, 2021 Price | Feb. 13, 2021 Price | Percentage Change |
|---|---|---|---|
| Southern Star | $3.655 | $329.595 | 8,918% |
| Panhandle Eastern | $3.525 | $224.560 | 6,270% |
| NGPL | $3.330 | $206.110 | 6,089% |
| NGPL, Amarillo | $3.400 | $180.195 | 5,200% |
| Enable Gas | $3.355 | $375.810 | 11,101% |
| ANR | $3.545 | $213.895 | 5,934% |
| Cheyenne Hub | $3.415 | $187.690 | 5,396% |
| CIG, Rockies | $3.395 | $172.945 | 4,994% |
| Northern Natural Gas, demarcation | $3.715 | $231.670 | 6,136% |
| Northern Natural Gas, Ventura | $4.200 | $154.905 | 3,588% |
| Oklahoma ANR | $3.545 | $213.895 | 5,934% |

Winter Storm Uri's effects on the natural-gas market extended well beyond Kansas.  Gas wellheads in Kansas, Oklahoma, Texas, and Louisiana froze during the storm, causing a significant

---

[3] All index prices shown in the table are taken from the Complaints' allegations.  *See Stoneberger* ¶¶ 37, 39; *Mehl* ¶¶ 43, 45; *Rebein* ¶¶ 33, 35; *Rice* ¶¶ 39, 41; *Deutscher* ¶¶ 30, 32.

disruption in natural-gas supply.  Ex. A (Kan. Municipal Energy Agency, 2021 Annual Report 6 (2021), https://kmea.com/wp-content/uploads/2022/09/2021-Annual-Report-Final.pdf) (cited at *Stoneberger* ¶ 55 n.11).  These supply disruptions, along with the acute spike in demand for natural gas, led to increased daily index prices as reported by Platts, so much so that Winter Storm Uri precipitated the highest prices ever on most of the midcontinent pipelines in Texas, Oklahoma, and Kansas.  *See id*.  And these are just the index midpoint prices, with parties agreeing to pay even more for gas in individual wholesale transactions.  For example, Platts' publicly reported data show the following:

- On Friday, February 12, prices at Enable Gas, East ranged from $250-500; prices at Southern Star ranged from $255-400; and prices at ONEOK ranged from $125-600.

- On Tuesday, February 16, prices at NGPL Midcontinent ranged from $95-680; prices at Southern Star ranged from $300-700; and prices at ONEOK ranged from $800-999.

- On Wednesday, February 17, prices at Enable Gas, East ranged from $350-500; and prices at ONEOK ranged from $1,100-1,250.[4]

In purchasing additional natural gas in the spot market at historically high index prices, the five Distributors necessarily incurred higher costs during Winter Storm Uri.  *Stoneberger* ¶ 63; *Mehl* ¶ 72; *Rebein* ¶ 62; *Rice* ¶ 67; *Deutscher* ¶ 48.  Rather than internalize those higher costs, all five of the Distributors elected to shift their higher costs downstream to residential customers, including Plaintiffs, in order "[t]o make a profit."  *Rebein* ¶ 29; *see Stoneberger* ¶ 28; *Mehl* ¶ 30; *Rice* ¶ 35; *Deutscher* ¶ 26.  For example, the State of Kansas loaned more than $78 million to Kansas cities to cover the increased cost of natural gas during Winter Storm Uri on terms that

---

[4] These prices are in the Gas Daily publications on which Plaintiffs base their claims and that are discussed throughout the Complaints.  It is therefore appropriate for the Court to consider them in this motion, along with the other external sources cited in the Complaint.  *See, e.g.*, *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) ("In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits and documents incorporated into the complaint by reference.") (cleaned up); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).

permitted the cities to repay the loans over ten years.  *Stoneberger* ¶¶ 60-62.  One Distributor, KMGA, and its member cities then established their own programs to "'spread the costs of Winter Storm Uri over years to … retail customers.'"  *Id.* ¶ 64.  Three other Distributors (KGS, Atmos, and Black Hills) similarly worked with the KCC to "securitize" the millions of dollars in "extraordinary costs and financing costs" incurred during Winter Storm Uri.  *Mehl* ¶¶ 72-73, 77; *Rice* ¶¶ 67-68; *Rebein* ¶¶ 62-64.  Under the unanimous settlement agreements with those Distributors approved by the KCC, the Distributors' residential customers now receive a fixed securitization charge on their monthly utility bills.  *Mehl* ¶¶ 77-78; *Rice* ¶¶ 68-69, 71; *Rebein* ¶¶ 63-65.  The fifth Distributor (Midwest Energy) likewise approved a "natural-gas cost-recovery plan" to recover approximately $9.7 million "in excess natural gas charges" by passing those costs on to its residential customers over a period of two years.  *Deutscher* ¶¶ 47-48.

### D.    The Complaints

Beginning in 2023, Plaintiffs filed these five putative class actions in an attempt to recover from the thirteen Defendants the charges that the Distributors and various other entities levied on their monthly utility bills in the months and years after Winter Storm Uri.  Plaintiffs seek to bring these actions on behalf of putative classes of "all residential customers whose utilities were served" by one of the five Distributors.  *Stoneberger* ¶ 67; *Mehl* ¶ 83; *Rebein* ¶ 69; *Rice* ¶ 85; *Deutscher* ¶ 50.  Plaintiffs contend that Defendants, in selling natural gas to the Distributors or their suppliers in separate wholesale transactions at the higher daily index prices published by Platts during Winter Storm Uri, engaged in unconscionable acts, including unlawful profiteering, in violation of K.S.A. §§ 50-627 and 50-6,106.  Plaintiffs assert three separate claims against Defendants under the KCPA, including a claim for attorneys' fees.

**LEGAL STANDARD**

To survive a motion to dismiss, a complaint must "'raise a right to relief above the speculative level,' and must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Weckhorst v. Kan. State Univ.*, 241 F. Supp. 3d 1154, 1158 (D. Kan. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Id.* (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011)). In ruling on a motion to dismiss, courts may "take judicial notice of facts which are a matter of public record" without converting a motion to dismiss into a motion for summary judgment. *Ellis v. Chase Bank USA, NA*, 2017 WL 5158311, at *2 (D. Kan. Nov. 7, 2017). In particular, courts "may take judicial notice of filings with the … Kansas Corporation Commission." *In re Meis*, 2011 WL 6148654, at *3 n.6 (Bankr. D. Kan. Dec. 9, 2011) (citing *JP Morgan Trust Co. Nat'l Ass'n v. Mid-Am. Pipeline Co.*, 413 F. Supp. 2d 1244, 1258 (D. Kan. 2006)). When "a complaint fails to state a claim" and "granting leave to amend would be futile," the action should be dismissed with prejudice. *Knight v. Mooring Cap. Fund, LLC*, 749 F.3d 1180, 1190 (10th Cir. 2014) (quoting *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006)).

**ARGUMENT**

I.    **Plaintiffs Do Not Allege Any "Consumer Transaction" That Could Support a KCPA Claim Against Defendants.**

      A.    **Plaintiffs Do Not Allege That They Were Parties to the Challenged Wholesale Transactions.**

Plaintiffs' KCPA claims fail as a matter of law because Plaintiffs do not (and cannot) allege that they were parties to the challenged wholesale transactions between Defendants and the Distributors or their suppliers. *See* K.S.A. § 50-624(b), (c). As a consumer-protection law, the

KCPA only protects consumers "who actually contract with suppliers for goods or services." *Wright v. Enhanced Recovery Co.*, 227 F. Supp. 3d 1207, 1211 (D. Kan. 2016). Plaintiffs here do not allege that they have any relationship at all with Defendants. They instead challenge Defendants' natural-gas sales to highly sophisticated commercial counterparties in arm's-length wholesale transactions to which Plaintiffs were not parties and in which they had no role. But the KCPA does not apply to the prices charged to others in wholesale transactions that do not involve consumers.

Under the KCPA, a "consumer transaction" is "a sale, lease, assignment or other disposition for value of property or services within this state … *to a consumer*." K.S.A. § 50-624(c) (emphasis added). A "consumer," in turn, is "an individual, husband and wife, sole proprietor, or family partnership who seeks or acquires property or services for personal, family, household, business or agricultural purposes." K.S.A. § 50-624(b). As a result, the challenged transactions between Defendants and the Distributors or their suppliers were not "consumer transactions" under the KCPA.

The provisions of the KCPA that are the bases for Plaintiffs' claims here are equally clear that they apply only to sales to *consumers*. Section 50-627 provides that "no supplier shall engage in any unconscionable act or practice *in connection with a consumer transaction*," K.S.A. § 50-627(a) (emphasis added), and Section 50-6,106 provides that "profiteer from a disaster" means to increase prices "unjustifiably … during a time of disaster … at which any necessary property or service is offered for sale *to consumers*," K.S.A. § 50-6,106(b)(1) (emphasis added).[5]

---

[5] Section 50-6,106 does not operate separately from § 50-627; instead, § 50-6,106 provides that profiteering from a disaster is "an unconscionable act within the meaning of K.S.A. § 50-627." K.S.A. § 50-6,106. A claim under § 50-6,106 therefore must satisfy all the requirements of a claim under § 50-627.

By its express terms, the KCPA does not apply to the transactions between Defendants and the Distributors (or their suppliers), which involved wholesale sales of gas to sophisticated commercial entities for resale to consumers.

The case law affirms this reading of the KCPA's plain language.   Only "'consumers' engaged in 'consumer transactions' with 'suppliers'" can assert KCPA claims for an unconscionable act or practice.  *Berry v. Nat'l Med. Servs., Inc.*, 41 Kan. App. 2d 612, 621, 205 P.3d 745, 752 (2009); *see also Kastner v. Intrust Bank*, 2011 WL 2149432, at *3-4 (D. Kan. June 1, 2011), *aff'd*, 569 F. App'x 593, 599 (10th Cir. 2014).  Although a seller need not deal "directly with the consumer" to qualify as a "supplier" under the KCPA, K.S.A. § 50-624(l), courts have held that the consumer "must have been a *party to the contract for purchase*" challenged under the KCPA to state a claim.  *Hayes v. Find Track & Locate, Inc.*, 60 F. Supp. 3d 1144, 1151 (D. Kan. 2014) (emphasis added).  As both the Tenth Circuit and the Kansas Court of Appeals have explained, the KCPA's "protection is limited to individuals … who directly contract with suppliers for goods or services," *Kastner*, 569 F. App'x at 599 (quoting *CIT Grp./Sales Fin., Inc. v. E-Z Pay Used Cars, Inc.*, 29 Kan. App. 2d 676, 685, 32 P.3d 1197, 1204 (2001)); *accord Ellibee v. Aramark Corr. Servs., Inc.*, 37 Kan. App. 2d 430, 433, 154 P.3d 39, 41 (2007), or who at least are "directly in contact with the supplier," *Krause v. Nationstar Mortg., LLC*, 2015 WL 4041662, at *2 (D. Kan. July 1, 2015).

Plaintiffs here do not allege that they had any contact at all with any Defendant, much less that they contracted with a Defendant to purchase natural gas.  Nor do Plaintiffs allege that they had any role in the challenged wholesale transactions between Defendants and their counterparties. Plaintiffs instead concede that Defendants sold natural gas to large natural-gas distributors in wholesale transactions to which Plaintiffs were not parties and had no involvement.  *Stoneberger*

-13-

¶¶ 3, 10-13; *Mehl* ¶¶ 3, 10-15; *Rebein* ¶¶ 3, 9-14; *Rice* ¶¶ 3, 8-15; *Deutscher* ¶¶ 3, 10-11. Plaintiffs cannot save their claims by alleging that Defendants were "aware that the natural gas [they] sold … was primarily used to service the residential consumer market in Kansas," *Stoneberg* ¶¶ 10-13; *Mehl* ¶¶ 10-15; *Rebein* ¶¶ 9-14; *Rice* ¶¶ 8-15; *Deutscher* ¶¶ 10-11, and that, "[t]o make a profit, distributors … include the cost of the natural gas in the ultimate price that they charge their customers," *Rebein* ¶ 29; *see Stoneberger* ¶ 28; *Mehl* ¶ 30; *Rice* ¶ 35; *Deutscher* ¶ 26. Those allegations, even if true, cannot convert wholesale transactions between sophisticated commercial entities into consumer transactions. Mere awareness that a product may reach a consumer downstream is not enough to transform a wholesale commercial transaction into a consumer transaction. By pleading that Defendants sold natural gas to the Distributors or their suppliers in wholesale transactions and that the Distributors subsequently resold the gas to retail customers like Plaintiffs, the Complaints' allegations confirm that Plaintiffs were not a "party to the contract[s] for purchase" that they seek to challenge under the KCPA. *Hayes*, 60 F. Supp. 3d at 1151. That is fatal to all of their claims under the KCPA.

Courts routinely reject KCPA claims for this exact reason. In *Hayes*, for example, the court held that the son of a truck buyer who contributed $500 toward the purchase of a truck was not a "consumer," and thus could not sue under the KCPA, "because he was not a party to the contract for the purchase of the truck." 60 F. Supp. 3d at 1152; *see also Kestrel Holdings I, L.L.C. v. Learjet Inc.*, 316 F. Supp. 2d 1071, 1076-77 (D. Kan. 2004) (allegation that plaintiffs "wrote checks from their individual bank accounts to pay for [an] aircraft" did "not change the fact" that plaintiffs were not parties to the "purchase agreement" for the aircraft, and therefore could not bring a KCPA claim). Similarly, in *Luttrell v. Brannon*, 2018 WL 3032993, at *12-14 (D. Kan. June 19, 2018), the court held that the plaintiff could not bring a KCPA claim for unconscionable pricing against

the manufacturer of a medical device unless "the device was sold directly to" the plaintiff by the manufacturer and not sold to the hospital "for use in his surgery."  The Kansas Court of Appeals likewise has rejected attempts by plaintiffs to bring KCPA claims based on transactions to which they were not a party.  *See Berry*, 41 Kan. App. 2d at 622, 205 P.3d at 752 (no KCPA claim where the plaintiff's "factual allegations disclose transactions between [a third party] and the defendants but not a consumer transaction between [the plaintiff] and the defendants"); *Ellibee*, 37 Kan. App. 2d at 433, 154 P.3d at 41 (motion to dismiss properly granted where "[defendant] made no representations to [plaintiff] or engaged in any negotiations with him").

In opposing this motion, Plaintiffs may point to *City of Mulberry v. BP Energy Co.*, No. 2021-CV-000031 (Kan. Dist. Ct. Feb. 9, 2022) (Ex. B).[6]  But *Mulberry*, an outlier state district court decision, is distinguishable on its facts.  The City of Mulberry and certain of its residents alleged in that case that BP Energy Company violated the KCPA by charging the City unconscionable prices for natural gas during Winter Storm Uri.  *Id.* at 5-6.  The court dismissed the City's claims because it was not a "consumer" but held that the individual residents had standing to sue under the KCPA.  *Id.* at 5-6, 12.  The court there stressed that the "citizens of Mulberry pay taxes so that city officials represent them in … obtaining natural gas" and that the amount the City pays for natural gas is automatically passed on to residents.  *Id.* at 12.  Here, by contrast, Defendants' counterparties—the Distributors or their suppliers—are not government officials who purchase natural gas with taxpayer money as agents for residents.  The Distributors and their suppliers are private commercial entities, and their relationships with Plaintiffs, if any, are no different from that of any other distributor or intermediary that purchases a good in the

---

[6] As an unpublished decision, *Mulberry* "is not binding precedent" under Kansas rules, except in certain enumerated situations inapplicable here (*e.g.*, res judicata).  Kan. Sup. Ct. R. 7.04.

wholesale market and then resells it to consumers.  Furthermore, the *Mulberry* court incorrectly concluded that "the case law in this area is scarce," ignoring the large body of case law holding that the KCPA's protection is limited to consumers who were parties to the challenged transaction. *Id.* at 7, 13.

### B. Plaintiffs Do Not Allege Any Conduct by Defendants "in Connection with" a Consumer Transaction Involving Plaintiffs.

The KCPA provision at issue here applies only to an "unconscionable act or practice *in connection with a consumer transaction*."  K.S.A. § 50-627(a) (emphasis added).  The only consumer transactions alleged in these cases are Plaintiffs' purchases of natural gas from the Distributors or local municipal entities.  Defendants are not alleged to have engaged in any unconscionable act or practice "in connection with" those transactions.  Plaintiffs instead challenge the prices allegedly charged by Defendants in separate wholesale transactions.  The only alleged link between those wholesale transactions and the transactions involving Plaintiffs is that the Distributors or local municipal entities resold the natural gas to Plaintiffs.  If such resales were enough to establish that Defendants engaged in an unconscionable act in connection with a consumer transaction, then *every* upstream transaction in a chain of distribution involving wholesalers, distributors, and other intermediaries would be "in connection with" a downstream consumer transaction.  Such a reading of the KCPA would stretch its language beyond the breaking point, eliminating any distinction between wholesale and consumer transactions.

Although Kansas courts have not expressly addressed the KCPA's "in connection with" requirement, courts in Ohio have interpreted a nearly identical statute[7] to require the plaintiff to

---

[7] The Kansas and Ohio consumer-protection statutes are both derived from the Uniform Law Commission's Consumer Sales Practices Act, and both statutes proscribe "supplier[s]" from engaging in an "unconscionable act or practice in connection with a consumer transaction."  *Compare* K.S.A. § 50-627(a), *with* Ohio Rev. Code § 1345.03(A).

show that the defendant acted "'in connection with' *the* consumer transaction at issue," not merely that the good sold by the defendant was later resold to a consumer. *See Lester v. Wow Car Co.*, 2014 WL 2567087, at *9 (S.D. Ohio June 6, 2014), *aff'd*, 601 F. App'x 399 (6th Cir. 2015). For example, the plaintiff in *Price v. Lambert Ford, Inc.*, 1992 WL 103746, at *1 (Ohio Ct. App. May 13, 1992), purchased a defective Ford Thunderbird from a Ford dealership that had bought it from a different dealership. The court held that the first dealer was not liable to the plaintiff under Ohio's consumer-protection statute because that dealer's upstream sale of the defective car to the second dealer was only "a business transaction with another Ford dealer, not a consumer transaction with" the plaintiff. *Id.* at *2. Similarly, the court in *Hahn v. Doe*, 1995 WL 127863, at *1, *9 (Ohio Ct. App. Mar. 23, 1995), held that a drywall manufacturer could not be liable for a retailer's sale of its defective drywall to plaintiffs with whom the manufacturer "had no contact whatsoever," and where the plaintiffs were "completely unaware of the existence of [the manufacturer] at the time of their drywall purchase." As the court explained, a defendant must have "some connection to a consumer transaction, beyond merely manufacturing a product." *Id.* at *9. In both *Price* and *Hahn*, the defendants originally sold the product at issue, but they were not liable to the consumers who ultimately purchased the product because they had no connection with the downstream consumer transaction. Similarly here, Plaintiffs do not allege that Defendants had any connection to the downstream consumer transactions between Plaintiffs and their Distributors or their municipal entities other than that the Distributors and municipal entities resold the natural gas to Plaintiffs.

These decisions are consistent with the unpublished decision in *Cole v. Hewlett Packard Co.*, 2004 WL 376471 (Kan. Ct. App. Feb. 27, 2004), which held that the "in connection with a consumer transaction" requirement was satisfied because the plaintiff had adequately alleged a

direct connection between the defendant and her.  In *Cole*, a plaintiff who purchased a Hewlett Packard ("HP") printer from a third party alleged that HP engaged in deception and unconscionable acts by including ink cartridges that were only half full "inside the box" without bringing that fact "to the attention of the purchaser by way of notice on the box." *Id.* at *2-3.  Plaintiff further alleged that HP's "advertisements, marketing materials, and labelling" indicated that "consumers are to receive ink cartridges that were full." *Id.* at *1.  In holding that the plaintiff had adequately alleged a consumer transaction, the court stated that "HP's alleged deceptive and unconscionable acts occurred *in connection with* a consumer transaction" even though the plaintiff did not buy her printer directly from HP. *Id.* at *6 (emphasis added).[8]  In *Cole*, unlike here (or in *Price* or *Hahn*), there was a direct connection between HP and the plaintiff:  plaintiff's claims were based on representations that HP made directly to her and other consumers in its packaging, advertisements, and other marketing materials.  Here, by contrast, Plaintiffs do not allege any connection to Defendants—Plaintiffs are not parties to any transaction with Defendants, and Defendants did not make any representations to Plaintiffs.  Plaintiffs thus do not base their claims on Defendants' conduct "in connection with" any consumer transaction involving Plaintiffs but rather on Defendants' prices in separate wholesale transactions in which Plaintiffs had no involvement.

*        *        *

In sum, Plaintiffs admit that they had no involvement in Defendants' upstream wholesale transactions, and Plaintiffs do not (and cannot) allege any unconscionable acts by Defendants "in connection with" Plaintiffs' downstream consumer transactions with the Distributors or their local

---

[8] The court ultimately rejected the plaintiff's KCPA claim because she "admitted that she did not see the printer box, visit HP's website in connection with her purchase, or review any written material about the … printer before making her purchase." 2004 WL 376471, at *8.

municipalities.  For these reasons, Plaintiffs' KCPA claims in the five consolidated actions fail as

a matter of law and should be dismissed for failure to state a claim.

## II.     Defendants Are Not "Suppliers" Under the KCPA Because Plaintiffs Do Not Allege That Defendants Solicit, Engage in, or Enforce Consumer Transactions in the Ordinary Course of Business.

Plaintiffs also fail to state a KCPA claim because they do not plausibly allege that

Defendants are "suppliers" within the meaning of the KCPA.  Plaintiffs insist that Defendants

satisfy the KCPA's definition of "suppliers" because "they sold natural gas in the ordinary course

of business to Plaintiffs, whether or not they dealt directly with Plaintiffs."  *Stoneberger* ¶ 86; *Mehl*

¶ 102; *Rebein* ¶ 88; *Rice* ¶ 104; *Deutscher* ¶ 69.  That allegation ignores crucial limiting language

in the statutory definition of "supplier."   The KCPA defines a "supplier" as "a manufacturer,

distributor, dealer, seller, lessor, assignor, or other person who, *in the ordinary course of business,*

*solicits, engages in or enforces consumer transactions*, whether or not dealing directly with the

consumer."  K.S.A. § 50-624(l) (emphasis added).  Under the statute's plain language, Defendants

are not suppliers of natural gas within the meaning of the KCPA because Plaintiffs do not allege

that they solicit, engage in, or enforce consumer transactions in the ordinary course of business.

Plaintiffs do not allege that Defendants have done anything to "enforce" a consumer

transaction.  As a result, the question of whether Defendants are "suppliers" under the KCPA turns

on whether they allegedly "solicit" or "engage in" consumer transactions "in the ordinary course

of business."   Under Kansas law, companies "solicit" consumer transactions when they advertise

the product to consumers or otherwise seek to encourage consumers to purchase the product.

*Alexander v. Certified Master Builders Corp.*, 268 Kan. 812, 826, 1 P.3d 899, 909 (2000)

("advertising and distribution of brochures" to customers qualifies as solicitation); *see also*

*Solicitation*, Black's Law Dictionary (11th ed. 2019) ("solicitation" means "[t]he act or

instance of requesting or seeking to obtain something; a request or petition").  Because the KCPA

does not define the phrase "engage in" and Kansas courts have not construed it in the context of the KCPA, that phrase should be given its ordinary meaning.  *See State v. Dooley*, 308 Kan. 641, 656, 423 P.3d 469, 479 (2018) ("When [the] Legislature does not define a term or phrase, [courts] ascertain legislative intent by giving common words their ordinary meanings.").  To "engage" in something means "[t]o employ or involve oneself; to take part in; to embark on."  *Engage*, BLACK'S LAW DICTIONARY (11th ed. 2019).  Accordingly, "suppliers" under the KCPA are sellers that regularly take part in, or seek to enter into, consumer transactions.  *See Anderson v. Barclay's Cap. Real Est., Inc.*, 989 N.E.2d 997, 1003 (Ohio 2013) ("[S]uppliers" under Ohio's consumer-protection statute "are those that cause a consumer transaction to happen or that seek to enter into a consumer transaction.").[9]

Plaintiffs do not (and cannot) allege that Defendants solicit or engage in consumer transactions in the ordinary course of their businesses.  Defendants are wholesalers in the business of selling natural gas to sophisticated commercial entities that, in turn, resell the gas.  Those resales may include resales to consumers, but they also may include resales to commercial purchasers (such as business and agricultural users) in an undifferentiated stream.  Plaintiffs do not allege that Defendants market or advertise their product to consumers.  Indeed, most Plaintiffs likely did not even know which companies sold natural gas to their utilities, as evidenced by the fact that the *Rice* Plaintiffs, for example, required discovery to name the Defendants in their case.

This distinguishes Defendants from consumer-goods manufacturers like HP in *Cole*.  *See supra* at 17-18.  A consumer-goods manufacturer may "solicit" the sale of its products to

---

[9] *See supra* note 7.  The definition of "supplier" in Ohio's consumer-protection statute is similar to the definition in the KCPA.  *See* Ohio Rev. Code § 1345.01(C) ("'Supplier' means a seller, lessor, assignor, franchisor, or other person engaged in the business of effecting or soliciting consumer transactions, whether or not the person deals directly with the consumer.").

consumers through its marketing campaigns, promotions, advertisements, suggested pricing, or warranties and thus qualify as a "supplier" under the KCPA even though it does not sell its products directly to consumers.  In contrast, Defendants here had no contact with consumers at all.  Because Plaintiffs do not allege that Defendants solicit, engage in, or enforce consumer transactions in the ordinary course of business, Defendants are not "suppliers" under the KCPA, and Plaintiffs' KCPA claims should be dismissed.

### III.    Plaintiffs Do Not Allege That They Have Suffered a Loss Proximately Caused by Defendants' Wholesale Transactions.

Plaintiffs' claims fail for an additional, independent reason:  the Complaints do not plead that Plaintiffs have suffered a loss proximately caused by Defendants' wholesale agreements with others.  Plaintiffs claim injury based on higher charges included on their monthly utility bills after Winter Storm Uri.  Yet they allege a number of intervening events between Defendants' wholesale transactions and those charges that break any causal chain.

Only "[a] consumer who suffers loss as a result of a violation of [the KCPA] may bring a class action for the damages caused by [the] act or practice."  K.S.A. § 50-634(d).[10]  A KCPA plaintiff therefore must plead "that there was a causal connection between the [challenged] act"—here, the price charged in Defendants' wholesale transactions with others—"and the claimed injury."  *Schneider v. Liberty Asset Mgmt.*, 45 Kan. App. 2d 978, 985, 251 P.3d 666, 671 (2011).  This causal connection must be proximate.  *See id.* at 986, 251 P.3d at 672.  A consumer can sue

---

[10] Many of the cases addressing the KCPA's causation requirement were actions for declaratory or injunctive relief or individual actions for damages or a civil penalty for which a consumer must show that he or she was "aggrieved by" the violation of the KCPA.  K.S.A. § 50-634(a), (b).  The causation requirement for class actions for damages brought under K.S.A. § 50-634(d) similarly requires that the plaintiff "suffer[] loss as a result of" the violation.  *Benedict v. Altria Grp., Inc.*, 241 F.R.D. 668, 677-79 (D. Kan. 2007) (observing that "K.S.A. 50-634(d) requires the same causal connection" as K.S.A. § 50-634(b)).

for damages under the KCPA only if the consumer was "*directly* affected by" the defendant's alleged violation of the KCPA.  *Finstad v. Washburn Univ.*, 252 Kan. 465, 472, 845 P.2d 685, 691 (1993) (emphasis added and internal quotation marks omitted).  A consumer cannot sue under the KCPA when an "intervening event" between the defendant's actions and the consumer's alleged injury breaks the causal chain.  *See Schneider*, 45 Kan. App. 2d at 986, 251 P.3d at 672.

Plaintiffs fail to allege that Defendants' sales of natural gas to the Distributors or their suppliers at daily index prices published by Platts proximately caused their alleged injuries. During the storm, Governor Kelly "declared a state of emergency over the sustained and extreme cold weather that Kansans were facing," and the next day, the KCC ordered natural-gas utilities "'to do all things possible and necessary to ensure natural gas … services continue to be provided to their customers in the State.'"  *Stoneberger* ¶¶ 42-43; *Mehl* ¶¶ 48-49; *Rebein* ¶¶ 36-37; *Rice* ¶¶ 44-45; *Deutscher* ¶¶ 34-35.  Pursuant to the KCC's order, "natural-gas distributors" elected to make "substantial purchases of natural gas at the prevailing spot price to ensure their storages of natural gas would not run low."  *Stoneberger* ¶ 44; *Mehl* ¶ 50; *Rebein* ¶ 38; *Rice* ¶ 46; *Deutscher* ¶ 36.

Numerous intervening events occurred between Defendants' wholesale transactions with the Distributors or their suppliers at the prevailing spot price determined by Platts' daily index and the charges ultimately appearing on Plaintiffs' monthly utility bills that break any direct causal connection.  According to the Complaints, "[t]o make a profit, [the Distributors] include the cost of the natural gas in the ultimate price that they charge their customers."  *Rebein* ¶ 29; *see Stoneberger* ¶ 28; *Mehl* ¶ 30; *Rice* ¶ 35; *Deutscher* ¶ 26.  Plaintiffs acknowledge that the Distributors, not Defendants, were the ones that chose to pass on the higher Winter Storm Uri-related costs to their customers and also decided, with input from additional third parties (the KCC

and the municipal entities served by the KMGA), the amounts of the charges and over what periods of time the Distributors would impose those charges:

- Three Distributors (KGS, Black Hills, and Atmos) received authorization from the KCC to securitize the costs they incurred during Winter Storm Uri and allocate those costs to consumers over several years. *See supra* at 10. Residential customers of utilities served by those three Distributors are paying a monthly charge as a result of the decisions by the KCC and those Distributors.

- A fourth Distributor (KMGA) chose to "allocate" the costs it incurred in purchasing natural gas during Winter Storm Uri to "member cities" in a manner that "spread" the increased costs "over years." *Stoneberger* ¶ 64. Similarly, "[m]any of the cities that KMGA serves passed ordinances to defer or spread out the cost they incurred … for natural gas during Winter Storm Uri." *Id.* ¶ 65. The Kansas legislature also established a loan program "to cover 'extraordinary … natural gas costs incurred'" during the storm and loaned more than $78 million to Kansas cities, including KMGA's member cities, at below-market interest rates to defray the increased cost of gas purchased in February 2021 over the next decade. *Id.* ¶¶ 60-63. Residential customers served by KMGA's member cities are paying the additional costs incurred by KMGA as a result of the decisions by KMGA and its member cities.

- The fifth Distributor (Midwest Energy) approved its own "natural-gas cost-recovery plan" to recover "excess natural gas charges" from February 2021 by adding a charge to its residential customers' bills for roughly 24 months. *Deutscher* ¶¶ 47-48. Residential customers served by Midwest Energy are paying that charge as a result of Midwest Energy's decision.

These allegations demonstrate that any increased costs that Plaintiffs incurred on their monthly utility bills resulted from the independent decision-making of other actors both during and after Winter Storm Uri—not from any alleged wholesale transactions involving Defendants in February 2021. As a result, Plaintiffs cannot show that they have suffered damages proximately caused by Defendants' wholesale transactions, which is fatal to all of their KCPA claims. *See Schneider*, 45 Kan. App. 2d at 986, 251 P.3d at 672; *Hills v. Arensdorf*, 543 F. Supp. 3d 1065, 1075-76 (D. Kan. 2021) (granting motion to dismiss KCPA claim based on lack of causation), *aff'd*, 2022 WL 3153657 (10th Cir. Aug. 8, 2022); *Farmer v. Kan. State Univ.*, 2017 WL 980460, at *15 (D. Kan. Mar. 14, 2017) (same), *aff'd*, 918 F.3d 1094 (10th Cir. 2019).

**IV.     Plaintiffs Do Not Allege That Any Defendant Engaged in an Unconscionable Act.**

Plaintiffs also fail to plead that any Defendant engaged in an unconscionable act under the KCPA.  Courts regularly hold that KCPA claims "must meet the higher pleading standard of Rule 9(b)."  *FTC v. Affiliate Strategies, Inc.*, 2010 WL 11470099, at *9 (D. Kan. June 4, 2010); *see also Lamb v. Daimler Truck N. Am. LLC*, 2023 WL 2967918, at *2 (D. Kan. Apr. 17, 2023); *Holman v. Fifth Third Bank, N.A.*, 2021 WL 5578549, at *5 & n.21 (D. Kan. Nov. 30, 2021); *Pinkney v. TBC Corp.*, 2020 WL 1528544, at *6 (D. Kan. Mar. 31, 2020); *Burton v. R.J. Reynolds Tobacco Co.*, 884 F. Supp. 1515, 1524 (D. Kan. 1995).  To survive a motion to dismiss, Plaintiffs thus "'must set forth the time, place, and contents'" of the alleged wrongful conduct, identify the parties involved, and name the consequences of the supposed conduct.  *Jones v. Google LLC, Inc*., 2020 WL 1862575, at *2 (D. Kan. Apr. 14, 2020).  Even under Rule 8(a)'s pleading standard, a complaint fails to state a claim if it does not give each Defendant "fair notice of what the … claim is" against it "and the grounds upon which [the claim] rests." *Twombly*, 550 U.S. at 555.[11]

To allege unconscionable conduct in violation of the KCPA under any pleading standard, "there must be both deceptive behavior and unequal bargaining power between the parties." *Tomes*, 2023 WL 3995665, at *4; *see also*, *e.g.*, *Shigo v. Clark*, 2022 WL 2966320, at *6 (D. Kan. July 27, 2022); *Schneider v. U.S. Bank, N.A.*, 2020 WL 4673159, at *6 (D. Kan. Aug. 12, 2020). The Complaints here allege neither.  Plaintiffs do not allege anything "deceptive" about the arm's-length transactions each Defendant supposedly negotiated before and during Winter Storm Uri.

---

[11] *See*, *e.g.*, *Sullivan v. Hartford Fin. Servs. Grp., Inc*., 2023 WL 4635888, at *3 (10th Cir. July 20, 2023) (declining to decide whether Rule 9(b) applies and affirming a dismissal of KCPA claims because a "review of the amended complaint … reveals that [the plaintiff] did not attempt to plead the 'supplier' and 'consumer' elements at all, with particularity or otherwise"); *Tomes v. LoanCare, LLC*, 2023 WL 3995665, at *4 (D. Kan. June 14, 2023) ("The court need not decide" whether Rule 8(a) or 9(b) applies to KCPA claim "because it concludes that under any pleading standard, Plaintiff has failed to show unconscionable conduct.").

To the contrary, Plaintiffs allege that the Distributors or their suppliers purchased gas from Defendants "at the prevailing spot price" published by an independent third party, Platts, and that the Distributors or their suppliers continued to make purchases at the spot price even as Winter Storm Uri worsened. *Stoneberger* ¶¶ 44, 46; *Mehl* ¶¶ 50, 52; *Rebein* ¶¶ 38, 40; *Rice* ¶¶ 46, 48; *Deutscher* ¶¶ 36-37. In fact, many of the deals pursuant to which the Distributors or their suppliers acquired additional gas from Defendants in February 2021, including those that were based on daily index prices, were negotiated well before the storm.

Nor do Plaintiffs allege that there was unequal bargaining power between the parties to the wholesale transactions challenged in the Complaints—*i.e.*, Defendants and the Distributors or their suppliers. The counterparties that purchased natural gas from Defendants in the challenged transactions are large and sophisticated commercial entities with extensive experience negotiating natural-gas transactions. Nothing in the Complaints suggests that Defendants' alleged sales of natural gas to these counterparties were anything other than arm's-length transactions negotiated by highly sophisticated companies.

Because Plaintiffs do not allege either "deceptive bargaining or unequal bargaining power in negotiating the contract at issue," *Dana v. Heartland Mgmt. Co.*, 48 Kan. App. 2d 1048, 1066, 301 P.3d 772, 784 (2013), they fail to plead a claim for unconscionable conduct under K.S.A. § 50-627.

Plaintiffs' own allegations also defeat their theory that Defendants profiteered from a disaster under K.S.A. § 50-6,106 by unjustifiably increasing the prices they charged in the challenged wholesale transactions during Winter Storm Uri. Plaintiffs do not allege that Defendants themselves increased their wholesale prices to the Distributors or their suppliers during a time of disaster. They instead allege that spot prices before, during, and after the storm remained

tied to the floating daily index prices published by Platts in accordance with industry practice. Those index prices increased not because of any Defendant's decision to inflate its own prices during a time of disaster, but because of Winter Storm Uri's effect on natural-gas prices throughout the entire region, which was reflected in Platts' surveys of natural-gas trades.  Furthermore, Plaintiffs do not allege that Defendants' prices exceeded those at which similar products were "readily obtainable by other consumers in the trade area," as required by K.S.A. § 50-6,106(b)(1)(B).  In fact, Plaintiffs allege the opposite:  that "[m]ost producers and marketers tie the price that they charge for natural gas to S&P Global's Platts market index." *Stoneberger* ¶ 17.

Finally, Plaintiffs allege *no* facts to support their assertions that Defendants made *force majeure* declarations to avoid complying with fixed-price contracts in favor of higher-priced spot sales.  *Stoneberger* ¶¶ 53-54; *Mehl* ¶ 59; *Rebein* ¶¶ 44-46; *Rice* ¶ 56; *Deutscher* ¶¶ 41-43.  The Complaints do not identify which Defendants allegedly declared *force majeure*, but instead refer only to "distributors" and "suppliers" generally.  *Stoneberger* ¶¶ 53-54; *Mehl* ¶ 59; *Rebein* ¶¶ 44-46; *Rice* ¶ 56; *Deutscher* ¶¶ 41-43.  The Complaints also do not provide the date, location, or any other details about the supposed *force majeure* declarations.  Nor do they explain how these unspecified *force majeure* declarations by unidentified Defendants are even connected to a particular transaction between a specific Defendant and a specific Distributor, much less to any consumer transaction involving Plaintiffs.  Such general allegations and group pleading do not meet the fair-notice standard.

## V.     Plaintiffs' Claims Are Preempted by Federal Law.

Plaintiffs' claims directly challenging the pricing of wholesale transactions between Defendants and the Distributors or their suppliers under a state consumer-protection statute are also preempted by federal law, namely, the Natural Gas Act ("NGA") and FERC's exclusive jurisdiction under the NGA to determine the reasonableness of wholesale natural gas prices.

Federal preemption of state law "can occur in one of three ways: 1) when a federal statute expressly preempts state law ('express preemption'); 2) where Congress intends to occupy a field ('field preemption'); and 3) to the extent that a state law conflicts with a federal law ('conflict preemption')." *Colo. Dep't of Pub. Health & Env't v. United States*, 693 F.3d 1214, 1223 (10th Cir. 2012). "Conflict preemption occurs … where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *In re Universal Serv. Fund Tel. Billing Prac. Litig.*, 619 F.3d 1188, 1196 (10th Cir. 2010) (internal quotation marks omitted). "To avoid conflict preemption, it is not enough to say that the ultimate goal of both federal and state law is the same.  A state law is also pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal." *Colo. Dep't of Pub. Health & Env't*, 693 F.3d at 1224 (internal quotation marks omitted).

Both field and conflict preemption apply here.  Plaintiffs complain about the prices of wholesale gas transactions—prices that are subject to FERC's exclusive authority.  The challenged transactions involved "the sale in interstate commerce of natural gas for resale." *ONEOK, Inc. v. Learjet, Inc.*, 575 U.S. 373, 379 (2015).  Defendants allegedly sold natural gas in interstate commerce (directly or indirectly) to the Distributors, and that gas ultimately was resold to retail customers like Plaintiffs.  Plaintiffs contend that the wholesale transactions between Defendants and the Distributors violated the KCPA because Defendants' wholesale prices were too high.  Plaintiffs' claims, if allowed to proceed, would necessarily require a determination that Defendants' wholesale prices were unjust or unreasonable and thus would directly interfere with FERC's exclusive authority to regulate wholesale natural-gas prices.

The NGA gives FERC exclusive jurisdiction over (i) "the transportation of natural gas in interstate commerce," (ii) "the sale in interstate commerce of natural gas for resale" (*i.e.*, wholesale

transactions), and (iii) "natural-gas companies engaged in such transportation or sale." 15 U.S.C. § 717(b). As the Supreme Court has observed, in regulating the wholesale natural gas industry, "FERC adopted an approach that relie[s] on the competitive marketplace, rather than classical regulatory rate-setting, as the main mechanism for keeping wholesale natural-gas rates at a reasonable level." *ONEOK*, 575 U.S. at 380.

FERC has enforcement authority to prevent market manipulation by any entity "in connection with the purchase or sale of natural gas" subject to FERC's jurisdiction. 15 U.S.C. § 717c-1. FERC likewise has the authority to determine whether "any rate, charge, or classification … collected by any natural gas company in connection with any" sale of natural gas subject to FERC jurisdiction is "unjust, unreasonable, unduly discriminatory, or preferential." 15 U.S.C. § 717d(a). Under FERC's regulations, only FERC has the authority to declare wholesale natural-gas prices unjust or unreasonable.[12]

The Supreme Court has repeatedly found that state-law claims challenging wholesale natural-gas or power transactions—particularly state-law claims challenging the wholesale *price* of natural gas or electricity—are preempted by the NGA or the Federal Power Act.[13] In *Nantahala*

---

[12] *See Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation Under Part 284 of the Commission's Regulations, and Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol*, FERC Stats. & Regs. ¶ 30,939, 57 Fed. Reg. 13,267-02, 13,297 (1992) ("To repeat, there is no doubt, as Congress expressly found and confirmed, that a competitive market exists for gas at the wellhead and in the field . . . . It is important to note that only Congress can 'deregulate.' Therefore, the Commission is instituting light-handed regulation, relying upon market forces at the wellhead or in the field to constrain unbundled pipeline sale for resale gas prices within the NGA's 'just and reasonable' standard."), III FERC Stats. & Regs. ¶ 30,939 (Apr. 8, 1992), *reh'g granted and denied in part*; Order No. 636-A, III FERC Stats. & Regs. ¶ 30,950 (Aug. 3, 1992), *order on reh'g*; Order No. 636-B, 61 F.E.R.C. ¶ 61,272 (Nov. 27, 1992) (codified at 18 C.F.R. pt. 284), *reh'g denied*; 62 F.E.R.C. ¶ 61,007 (1993), *aff'd in part and remanded in part*, *United Distribution Cos. v. FERC*, 88 F.3d 1105 (D.C. Cir. 1996).

[13] Because of the similarities between the two acts, courts have treated precedents under each as applicable to the other. *See Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 164 n.10 (2016) ("This Court has routinely relied on NGA cases in determining the scope of the FPA, and vice versa.").

*Power & Light Co. v. Thornburg*, 476 U.S. 953, 966 (1986), the Court held that "FERC clearly has exclusive jurisdiction over the rates to be charged Nantahala's interstate wholesale customers. Once FERC sets such a rate, a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable."  The Court applied the same reasoning in *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 375 (1988), holding that "[t]he reasonableness of rates and agreements regulated by FERC may not be collaterally attacked in state or federal courts."  *See also id.* at 372 ("States may not bar regulated utilities from passing through to retail consumers FERC-mandated wholesale rates.").  And in *Hughes*, the Court held that a Maryland program regarding subsidies for electricity generators, which guaranteed a rate different from the interstate wholesale rate, was preempted by FERC's exclusive jurisdiction over the wholesale energy market.  578 U.S. at 154.  "By adjusting an interstate wholesale rate," the Court concluded, "Maryland's program invades FERC's regulatory turf."  *Id.* at 163.  These precedents show that state-law claims targeting wholesale natural-gas and electricity prices are preempted by federal law.

Here, Plaintiffs improperly seek to regulate—through a state consumer-protection statute—the *prices* of wholesale transactions subject to FERC's exclusive jurisdiction.  FERC announced several years ago that it was investigating wholesale natural-gas activities during Winter Storm Uri,[14] and it has not issued any finding that any Defendant's wholesale gas transactions in Kansas or elsewhere in February 2021 were unlawful.  In the absence of any action by FERC, the wholesale prices charged by Defendants to the Distributors were—by law—just and reasonable and not "unjust, unreasonable, unduly discriminatory, or preferential."  15 U.S.C.

---

[14] *See, e.g.*, *FERC to Examine Potential Wrongdoing in Markets During Recent Cold Snap* (Feb. 22, 2021),  https://www.ferc.gov/news-events/news/ferc-examine-potential-wrongdoing-markets-during-recent-cold-snap.

§ 717d(a); *see* 18 C.F.R. § 284.402.  And even if FERC had taken some action, under what is known as the *Mobile-Sierra* doctrine, because Defendants' wholesale prices were set by "freely negotiated wholesale-energy contract[s]," those prices are "presumed to meet the statutory 'just and reasonable' requirement.  *NRG Power Mktg., LLC v. Maine Pub. Utilities Comm'n*, 558 U.S. 165, 167 (2010) (citing *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956), and *Federal Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956)).[15]  Plaintiffs may not use the KCPA to collaterally attack "[t]he reasonableness of rates and agreements regulated by FERC."  *Miss. Power*, 487 U.S. at 372, 375; *see also Panhandle E. Pipeline Co. v. Oklahoma*, 83 F.3d 1219, 1221 (10th Cir. 1996); *Entergy Corp. v. Jenkins*, 469 S.W.3d 330, 345 (Tex. Ct. App. 2015).

Plaintiffs may attempt to rely on the Supreme Court's decision in *ONEOK*, but the state-law claims in that case did not challenge wholesale gas prices.  In *ONEOK*, the plaintiffs were "manufacturers, hospitals, and other institutions that bought natural gas *directly* from" the defendants for their own consumption.  575 U.S. at 376 (emphasis added).  They alleged numerous anticompetitive or manipulative practices in the market for natural gas that "affected *both* federally regulated wholesale natural-gas prices *and* nonfederally regulated *retail* natural-gas prices," such as "false price reporting, wash trades, and anticompetitive collusive behavior."  *Id*. at 376, 383.  The Court held that the NGA did not foreclose the plaintiffs' state-law claims based on "background marketplace conditions that affected both jurisdictional and nonjurisdictional rates" under a theory of field preemption, *id*. at 389, stressing that it "consider[ed] only the field-preemption question," *id*. at 377.  The Court further observed that the plaintiffs' claims did "not

---

[15] The *Mobile-Sierra* doctrine requires respect for private contracts by shielding them from regulatory interference except when necessary in the public interest.  *See Mobile Gas Serv.*, 350 U.S. at 332; *Sierra Pac. Power*, 350 U.S. at 348.

seek to challenge the reasonableness of any rates expressly approved by FERC."  *Id.* at 389. *ONEOK* thus does not disturb the rulings in cases like *Mississippi Power*—which held that state inquiries "directed at jurisdictional sales" are preempted—but rather reaffirms that "the significant distinction for purposes of pre-emption in the natural-gas context is the distinction between measures *aimed directly* at interstate purchasers and wholesales for resale, and those aimed at subjects left to the States to regulate."  *Id.* at 385, 389 (internal quotation marks omitted).

Unlike the *ONEOK* plaintiffs, Plaintiffs here are not suing the sellers from which they directly purchased natural gas, but rather are suing Defendants based on wholesale sales upstream from their retail purchases.  *See ONEOK*, 575 U.S. at 383 (noting that plaintiffs "bought large quantities of natural gas directly from [defendants] for their own consumption").  Plaintiffs also do not allege marketplace misconduct by Defendants such as "false price reporting, wash trades, or anticompetitive collusive behavior" that affected both wholesale and retail gas markets.  *Id.* Instead, Plaintiffs allege only that the prices Defendants charged in wholesale transactions in interstate commerce were too high under the KCPA.  This type of frontal assault on wholesale prices under state law is preempted.

In short, the only basis for Plaintiffs' claim that Defendants violated the KCPA is the price the Distributors or their suppliers agreed to pay Defendants in wholesale transactions in interstate commerce, which is squarely within FERC's exclusive jurisdiction.  Because Plaintiffs seek to challenge the reasonableness of wholesale prices, their claims are preempted by federal law based on principles of field preemption.  They also are barred by principles of conflict preemption because Plaintiffs' claims that Defendants charged unreasonable prices for wholesale natural gas in violation of the KCPA would necessarily conflict with FERC-granted blanket certificate authority and with the *Mobile-Sierra* doctrine.

**VI.    Plaintiffs' Claims in *Mehl*, *Rice and Rebein* Are Barred by the Filed-Rate Doctrine Because the KCC Has Primary Jurisdiction to Determine the Reasonableness of Retail Natural-Gas Rates in Kansas.**

Plaintiffs' claims in *Mehl*, *Rice*, and *Rebein* should be dismissed under the filed-rate doctrine, which protects a "regulatory agency's primary jurisdiction to determine the reasonableness of rates charged by regulated industries." *SWKI-Seward W. Cent.*, 2018 WL 385692, at *9. Under this doctrine, "courts lack authority to impose or enforce a different rate than that approved by the regulatory agency because the agency possesses primary jurisdiction to resolve such issues." *Id.*; *see also Phillips Pipe Line Co. v. Diamond Shamrock Ref. & Mktg. Co.*, 50 F.3d 864, 867 (10th Cir. 1995) (similar). Here, the filed-rate doctrine is derived originally from the Kansas Public Utilities Act, K.S.A. § 66-101, which grants the Kansas Corporation Commission ("KCC") exclusive jurisdiction to supervise and control in-state consumer utility rates. *See Farmland Indus., Inc. v. Kan. Corp. Comm'n*, 29 Kan. App. 2d 1031, 1039, 37 P.3d 640, 646 (2001) (citing *Sunflower Pipeline Co. v. Kan. Corp. Comm'n*, 5 Kan. App. 2d 715, 718-19, 624 P.2d 466, 470 (1981)).[16]

Plaintiffs in *Mehl*, *Rice*, and *Rebein* premise their claims against Defendants on monthly charges that their Distributors (KGS, Atmos, and Black Hills) are collecting to recoup some of the costs they incurred while purchasing gas in February 2021. *See Mehl* ¶¶ 78-79 ($5.64 per month); *Rice* ¶ 71 ($6.49 per month); *Rebein* ¶¶ 64-65 ($11.47 per month). In *Mehl* and *Rice*, the charges reflect tariffs authorized by statute and approved by the KCC following months of hard-fought administrative proceedings involving the Distributors and Plaintiffs' statutory consumer advocate,

---

[16] The filed-rate principles "that underlie the Public Utilities Act … are the same as those which underlie the Interstate Commerce Act of the United States" and other federal applications of the filed-rate doctrine. *Kan. Elec. Power Co. v. Thomas*, 123 Kan. 321, 255 P. 33, 35 (1927).

the Citizens' Utility Ratepayer Board.[17]  Those proceedings culminated in unanimous settlement agreements, under which KGS and Atmos agreed to "securitize" their respective Winter Storm Uri-related costs by issuing bonds and imposing flat monthly "securitization charge[s]" on Plaintiffs to service them.[18]  In *Rebein*, the KCC similarly authorized Black Hills to recoup its costs through a volumetric "surcharge."[19]

In *Mehl*, *Rice*, and *Rebein*, the KCC authorized the Distributors to recover specific filed rates from Plaintiffs, according those charges the effect of law.  *See* 64 AM. JUR. 2D *Public Utilities* § 52 (May 2024).  Plaintiffs' claims attack those rates in contravention of the KCC's "full power, authority and jurisdiction to supervise and control the public utilities … doing business in the state."  *Sunflower Pipeline Co.*, 5 Kan. App. 2d at 719, 624 P.2d at 469 (omission in original) (quoting K.S.A. § 66-101); *see also Danisco Ingredients USA, Inc. v. Kan. City Power & Light Co.*, 267 Kan. 760, 765, 986 P.2d 377, 381-82 (1999) (same).  The Plaintiffs in *Mehl* and *Rice* acknowledge this, citing the KCC's tariff docket—denoted "TAR"—to explain the origin of their

---

[17] *See*, *e.g.*, Financing Order, *In the Matter of the Application of Kansas Gas Service, a Division of ONE Gas, Inc., for the Recovery of Qualified Extraordinary Costs and Issuance of a Financing Order* ("*In re* KGS"), Docket No. 22-KGSG-466-TAR, at 1 & n.4, 23-24 ¶ 5 (Kan. Corp. Comm'n, Aug. 18, 2022) (citing K.S.A. § 66-1,240(b)(20)); Financing Order, *In the Matter of the Application of Atmos Energy Corporation for the Recovery of Qualified Extraordinary Costs and Issuance of a Financing Order* ("*In re* Atmos"), Docket No. 22-ATMG-538-TAR, at 1 & n.5, 24 ¶ 5 (Kan. Corp. Comm'n Oct. 25, 2022) (citing K.S.A. § 66-1,240(b)(20)).  K.S.A. § 66-1,240 was enacted in April 2021 as part of Kansas House Bill No. 2072, the Utility Financing and Securitization Act.

[18] *See*, *e.g.*, Order Approving Unanimous Settlement Agreement, *In re* KGS, Docket No. 22-KGSG-466-TAR, at 2-3 ¶¶ 3-4 (Kan. Corp. Comm'n, Aug. 18, 2022); Order Approving Unanimous Settlement Agreement, *In re* Atmos, Docket No. 22-ATMG-538-TAR, at 2 ¶¶ 3-4 (Kan. Corp. Comm'n Oct. 13, 2022).

[19] *See* Order Approving Unanimous Settlement Agreement, *In the Matter of the Investigation into Black Hills Kansas Gas Utility Company d/b/a Black Hills Energy Regarding the February 2021 Winter Weather Events, as Contemplated by Docket No. 21-GIMX-303-MIS* ("*In re* Black Hills"), Docket No. 21-BHCG-334-GIG, at 3-5 ¶ 9; Ex. A at 6 ¶ 16 (Kan. Corp. Comm'n Jan. 27, 2022).

claimed injuries. *See Mehl* ¶ 77 nn.67-68; *Rice* ¶ 71 n.24. *Rebein* similarly attacks charges set forth as "tariffs" in the unanimous Black Hills settlement agreement later approved by the KCC.[20]

Plaintiffs attempt to circumvent the tariffs—and to secure lower rates for themselves—by suing their Distributors' suppliers. But the filed-rate doctrine forbids them from doing so. *See, e.g.*, *Kan. Elec. Power Co.*, 123 Kan. at 321, 255 P. at 35; *Sunflower Pipeline Co.*, 5 Kan. App. 2d at 718-19, 624 P.2d at 470-71. "Deviation from [the filed rate] is not permitted upon *any pretext*. [All] must abide by it." *Pay Phone Concepts, Inc. v. MCI Telecommunications Corp.*, 904 F. Supp. 1202, 1206 (D. Kan. 1995) (emphasis added) (quoting *Louisville & N. R. Co. v. Maxwell*, 237 U.S. 94, 97 (1915)). This "prevents … nonadministrative collateral attacks on approved rates," including in private class actions. *Amundson & Assocs. Art Studio, Ltd. v. Nat'l Council on Comp. Ins., Inc.*, 26 Kan. App. 2d. 489, 501, 988 P.2d 1208, 1215 (1999); *see also Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 21-22 (2d Cir. 1994). Such challenges are prohibited even if they "do[] not directly attack the filed rate." *Hill v. BellSouth Telecomm., Inc.*, 364 F.3d 1308, 1317 (11th Cir. 2004). Indeed, "[t]he filed rate doctrine is not read so narrowly as to apply only to claims dealing specifically with rates charged. The nonprice aspects of services that are deemed binding on a customer, pursuant to the filed rate doctrine, include limitations on liability." 64 Am. Jur. 2d *Public Utilities* § 52 & nn.7-8.

In collaterally attacking the Distributors' filed rates, Plaintiffs stand to frustrate the two important rationales underlying the filed-rate doctrine that Kansas courts have consistently emphasized. The first is non-justiciability. "In Kansas, the regulation of public utilities is legislative—not judicial." *Grindsted Prod., Inc. v. Kan. Corp. Comm'n*, 262 Kan. 294, 309, 937

---

[20] *Compare Rebein* ¶¶ 64-65, *with* Order Approving Unanimous Settlement Agreement, *In re* Black Hills, Docket No. 21-BHCG-334-GIG, Ex. A at 6 ¶ 15 (Kan. Corp. Comm'n Jan. 27, 2022) (citing Appendix 1, which lists Plaintiffs' "volumetric surcharges" as tariffs).

P.2d 1, 11 (1997).  "The legislature created the Kansas Corporation Commission and granted it full and exclusive authority and jurisdiction to supervise, control, and regulate the public utilities of [Kansas]."  *Kan. Gas & Elec. Co. v. Kan. Corp. Comm'n*, 293 Kan. 483, 491, 720 P.2d 1063, 1072 (1986).  "Since discretionary authority has been delegated to the commission, not to the courts, the power of review does not give the courts authority to substitute their judgment for that of the commission."  *Sunflower Pipeline Co.*, 5 Kan. App. 2d at 718, 624 P.2d at 469 (quoting *Midwest Gas Users Ass'n v. State Corp. Comm'n*, 3 Kan. App. 2d 376, 380, 595 P.2d 735, 738 (1979)).  "The commission's decisions involve the difficult problems of policy, accounting, economics and other special knowledge," lending it a comparative advantage over courts when it comes to tariffs and rate-setting.  *Id.*

Because of the KCC's primary jurisdiction, Plaintiffs' claims in *Mehl*, *Rice*, and *Rebein* are not justiciable.  Distributors in Kansas routinely recover the costs of supplying natural gas "by imposing charges on [their] retail customers" through tariffs overseen by the commission.  *Kan. Pipeline Co. v. Kan. Corp. Comm'n*, 2002 WL 1398540, at *1-3 (D. Kan. June 24, 2002); *see also Danisco Ingredients*, 267 Kan. at 765, 986 P.2d at 381 ("Tariffs may be, and usually are, the handiwork of the regulated utility[.]").  Plaintiffs, in seeking to offset their tariff charges with KCPA damages awards, would unsettle "the integrity of the [KCC's] decision[s]," and "undermine … rate regulatory schemes by allowing a jury or a court to intrude" on the commission's supervision and control of utility prices in Kansas.  *Amundson*, 26 Kan. App. 2d at 501, 988 P.2d at 1215; *see also Purcell v. N.Y. Cent. R. Co.*, 197 N.E. 182, 184 (N.Y. 1935) (similar).  This Court thus should "declin[e] to adjudicate" Plaintiffs' claims to "accommodate the goal of non-justiciability inherent in the filed rate doctrine."  *Fax Telecommunicaciones v. AT&T,* 952 F. Supp. 946, 952 (E.D.N.Y. 1996) (citing *Wegoland Ltd.*, 27 F.3d at 21), *aff'd*, 138 F.3d 479 (2nd Cir.

1998).[21]  Abstention would be consistent with the KCC's recognition that the "Securitized Utility Tariff Charges" in *Mehl* and *Rice* "are *Nonbypassable* charges that *will be paid* by all existing or future Retail Customers receiving gas service."  Financing Order, *In re KGS*, Docket No. 22-KGSG-466-TAR, at 9 (Kan. Corp. Comm'n, Aug. 18, 2022) (citing K.S.A. § 66-1,241(b)(20)); *see also* K.S.A. § 66-1,241(e)(6) (similar).

The second rationale underlying the filed-rate doctrine is preventing discrimination between prices charged for the same service among different ratepayers.  *See Maislin,* 497 U.S. at 126; *Grindsted*, 262 Kan. at 308-09, 937 P.2d at 11; *Amundson*, 26 Kan. App. 2d at 496-97, 988 P.2d at 1212-13.  Here, the "anti-discrimination" function is served by the legal requirement that all KCC tariffs be "just and reasonable, *not unjustly or unreasonably discriminatory and not unduly preferential*."  *Grindsted*, 262 Kan. at 309, 937 P.2d at 11 (emphasis added); *see also Danisco Ingredients*, 267 Kan. at 765-66, 986 P.2d at 382 (similar).  The KCC proceedings recognize that the tariffs, among other things, guard against "discriminatory prices" between discrete customer classes.[22]

---

[21] Because "[t]he KCC has jurisdiction over the costs paid by [KGS] ratepayers," *Kan. Pipeline*, 2002 WL 1398540, at *1, judicial intervention would impinge on the KCC's regulatory authority and invite lawsuits by aggrieved ratepayers seeking to re-litigate final agency determinations.  This risk is neither speculative nor remote.  Less than three months ago, KGS filed an "Application for a net increase in base rates of $58.1 million."  Application for Kansas Gas Service, *In the Matter of the Application of Kansas Gas Service, a Division of ONE Gas, Inc. for Adjustment of its Natural Gas Rates in the State of Kansas*, Docket No. 24-KGSG-610-RTS, at 2 ¶ 3 (Kan. Corp. Comm'n, Mar. 1, 2024).  If approved, this application will increase "the average monthly residential bill … by approximately $6.71 for customers who use less natural gas and $9.48 for those who use more natural gas."  *Id.* at 22.  Allowing Plaintiffs' claims to proceed would open the floodgates to collateral attacks on KGS's anticipated rate increases and other filed rates approved by the KCC.

[22] *See, e.g.*, Order Approving Unanimous Settlement Agreement, *In re KGS*, Docket No. 22-KGSG-466-TAR, at 10–11 ¶¶ 20–22 (Kan. Corp. Comm'n Aug. 18, 2022); Order Approving Unanimous Settlement Agreement, *In re Atmos*, Docket No. 22-ATMG-538-TAR, at 11, ¶¶ 19– 21 (Kan. Corp. Comm'n Oct. 13, 2022); *see also* Order Approving Unanimous Settlement Agreement, *In re Black Hills*, Docket No. 21-BHCG-334-GIG, at 9–10 ¶¶ 24, 26 (Kan. Corp. Comm'n Jan. 27, 2022)

Plaintiffs nonetheless urge this Court to eliminate their share of the charges while leaving intact the additional charges owed by non-residential customers such as businesses not represented in these actions under the KCPA. If successful, Plaintiffs' claims would result in price discrimination between residential customers (whose additional charges would be eliminated or reduced) and non-residential customers (whose charges would stay the same).[23] The Court can avoid this inequity by deferring to the KCC's tariffs and dismissing the *Mehl*, *Rice*, and *Rebein* Complaints.

*     *     *

The filed-rate doctrine "prevents an aggrieved customer from enforcing … rights that contradict governing tariff provisions." *Pay Phone Concepts*, 904 F. Supp. at 1207. "This rule … obviously may work hardship in some cases," but it serves important public policy functions that stabilize utility rates in Kansas. *Id*. at 1206 (citing *Maislin,* 497 U.S. at 127); *see also* 64 AM. JUR. 2D *Public Utilities* § 52 ("When it applies, the filed rate doctrine is a nearly impenetrable shield and does not yield, no matter how compelling the equities."). Because of the filed-rate doctrine, the *Mehl*, *Rice*, and *Rebein* Plaintiffs were required to challenge the Winter Storm Uri-related charges in the KCC's administrative forum, and their claims against Defendants in this Court are barred as a matter of law.

---

(observing that the Black Hills settlement agreement "represents an equitable balancing of the interests of all parties" including "all classes of Black Hills' customers").

[23] For example, the *Mehl* Plaintiffs seek reimbursement of their 78.953% share of KGS's securitization without regard to the more than $50 million owed by the remaining non-Residential KGS customers. *See Mehl* ¶ 77; Financing Order, *In re KGS*, Docket No. 22-KGSG-466-TAR, Appendix A, PDF Page 100 (Kan. Corp. Comm'n, Aug. 18, 2022).

**VII.    Plaintiffs' Claims in *Rice* Relate to Transactions Even Further Upstream.**

Although none of the Complaints state a claim under the KCPA, Plaintiffs' claims in the *Rice* action are deficient in another respect.  In the other cases, Plaintiffs allege that Defendants sold wholesale gas to Distributors that then resold the gas to Plaintiffs.  Those claims fail because, as explained above, merely participating in an upstream transaction involving the subject property is not enough to show that a defendant acted "in connection with a consumer transaction."  *See supra* at 11-18.  In *Rice*, as to all but one of the Defendants, even that alleged upstream connection is missing.  Instead, the alleged connection between those Defendants' wholesale transactions and Plaintiffs' transactions is purely speculative.

The *Rice* claims are based on the allegation that certain Defendants made a few sales of natural gas to another wholesaler, nonparty Symmetry, somewhere on the Southern Star pipeline in February 2021.  *Rice* ¶¶ 78, 80-84.[24]  Plaintiffs allege only a single, attenuated connection to these upstream sales to Symmetry—namely, that Symmetry sold 40% of the gas it purchased on the Southern Star pipeline in February 2021 to Distributor Atmos, which, in turn, allegedly sold that gas to Plaintiffs and others.  *Id.* ¶ 34.  With the exception of Southwest Energy L.P., none of the Defendants in *Rice* is even alleged to have sold any gas to Atmos, the Distributor that allegedly resold the gas to Plaintiffs.  Those Defendants' natural-gas sales are thus even further removed from Plaintiffs than the challenged wholesale transactions in the other cases.

---

[24] As shown in their respective individual briefs, Defendants Williams Energy Resources LLC, CIMA ENERGY, LP, NextEra Energy Marketing, LLC, Tenaska Marketing Ventures, and Spotlight Energy, LLC did not actually sell gas to Symmetry.  Rather, the transactions Plaintiffs cite in support of their claims were actually with a different nonparty wholesaler, Shell Energy North America.  With respect to Defendant Concord Energy LLC, Plaintiffs do not identify a single specific transaction with Symmetry.  And with respect to Defendant Macquarie Energy LLC, as explained in Macquarie's individual brief, its transactions with Symmetry predated Winter Storm Uri and/or were non-Kansas transactions.

Nor does the Complaint even allege that Symmetry purchased all of its gas on the Southern Star pipeline from Defendants in February 2021.  As a result, Plaintiffs' allegations fail to demonstrate that Symmetry sold to Atmos any gas that it purchased from Defendants.  Plaintiffs' allegation that they *may have* purchased gas that was previously sold by one of the Defendants in an upstream transaction is not enough to establish that Defendants acted "in connection with a consumer transaction."  *See supra* at 11-18.  Accordingly, the *Rice* Plaintiffs have even less basis to challenge Defendants' wholesale transactions under the KCPA.

## CONCLUSION

Plaintiffs do not—and cannot—satisfy multiple elements of their KCPA claims (no challenged consumer transaction, no supplier, no proximate causation, and no unconscionable acts).  They improperly attempt to use a consumer-protection statute to challenge the prices charged in upstream wholesale transactions based on a floating daily index price published by an independent third party.  Plaintiffs' KCPA claims also are independently barred by state and federal regulators' exclusive jurisdiction to regulate retail natural-gas rates and the wholesale prices Plaintiffs seek to challenge.  Because the many flaws in the Complaints are incurable, the Complaints in all five consolidated actions should be dismissed in their entirety with prejudice.

Dated:  May 31, 2024

Respectfully submitted,

/s/ *Brian L. White*
Brian L. White, #20767
Casey L. Jones, #24970
HINKLE LAW FIRM LLC
1617 N. Waterfront Parkway, Suite 400
Wichita, Kansas  67206
Phone:  (316) 660-6200
Fax:  (316) 660-6024
bwhite@hinklaw.com
cjones@hinklaw.com

Andrew Zeve (*pro hac vice*)
Kyle Alden Mason (*pro hac vice*)
Sean Gorman (*pro hac vice*)
WHITE & CASE LLP
609 Main Street, Suite 2900
Houston, Texas  77002
Phone:  (713) 496-9700
Fax:  (713) 496-9701
andrew.zeve@whitecase.com
kyle.mason@whitecase.com
sean.gorman@whitecase.com

*Attorneys for Defendant Southwest Energy L.P.*

/s/ *David E. Bengtson*
David E. Bengtson, #12184
Logan Fancher, #28532
STINSON, LLP
1625 N. Waterfront Parkway, Suite 300
Wichita, Kansas  67206
Phone:  (316) 265-8800
Fax:  (316)265-1349
david.bengtson@stinson.com
logan.fancher@stinson.com

/s/ *Alan R. Pfaff*
Alan R. Pfaff, #12949
Roman K. Panickar, #30146
WALLACE SAUNDERS
200 West Douglas, Suite 400
Wichita, Kansas  67202
Phone:  (316) 219-8308
Fax:  (316) 316-269-2479
apfaff@wallacesaunders.com
rpanickar@wallacesaunders.com

Richard C. Pepperman II (*pro hac vice*)
Amanda F. Davidoff (*pro hac vice*)
Michael P. Devlin (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Phone:  (212) 558-4000
Fax:  (212) 558-3588
peppermanr@sullcrom.com
davidoffa@sullcrom.com
devlinm@sullcrom.com

*Attorneys for Defendants BP Energy Company and BP Canada Energy Marketing Corp.*

/s/ *Stephen R. McAllister*
Stephen R. McAllister, #15845
Megan M. Carroll, #29084
DENTONS US LLP
4520 Main Street Suite 1100
Kansas City, Missouri  64111
Phone:  (816) 460-2400
Fax:  (816) 531-7545
stephen.mcallister@dentons.com
megan.carroll@dentons.com

Mark A. Perry (*pro hac vice*)
Chantale Fiebig (*pro hac vice*)
Claire L. Chapla (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, D.C.  20036
Phone:  (202) 682-7000
mark.perry@weil.com
chantale.fiebig@weil.com
claire.chapla@weil.com

Liz Ryan (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas  75201
Phone: (214) 746-8158
liz.ryan@weil.com

*Attorneys for Defendant ETC Marketing, Ltd.*

/s/ Shane A. Rosson___
Shane A. Rosson, #24408
Tyler E. Heffron, #22115
TRIPLETT WOOLF GARRETSON LLC
2959 N. Rock Road, Suite 300
Wichita, Kansas  67226
Phone:  (316) 630-8100
Fax:  (316) 630-8101
sarosson@twgfirm.com
theffron@twgfirm.com

Johanna Spellman (*pro hac vice*)
LATHAM & WATKINS LLP
330 N. Wabash Avenue, Suite 2800
Chicago, Illinois  60611
Phone:  (312) 777-7039
Fax:  (312) 993-9767
johanna.spellman@lw.com

Nathan M. Saper (*pro hac vice*)
LATHAM & WATKINS LLP
355 S. Grand Avenue, Suite 100
Los Angeles, California  90071
Phone:  (213) 891-7485
Fax:  (213) 891-8763
nathan.saper@lw.com

William R. H. Merrill (*pro hac vice*)
Alexandra Foulkes Grafton (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas  77002
Phone:  (713) 615-9366
Fax:  (713) 654-6666
bmerrill@susmangodfrey.com
afoulkesgrafton@susmangodfrey.com

Beatrice C. Franklin (*pro hac vice*)
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: (212) 336-8330
bfranklin@susmangodfrey.com

*Attorneys for Defendant Macquarie Energy
LLC*

/s/ Jeffrey D. Morris___
Jeffrey D. Morris, #16123
BERKOWITZ OLIVER, LLP - KCMO
2600 Grand Boulevard, Suite 1200
Kansas City, Missouri  64108
Phone:  (913) 649-7007
Fax:  (816)561-1888
jmorris@berkowitzoliver.com

Stephen Crain (*pro hac vice*)
Bradley J. Benoit (*pro hac vice*)
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, Texas  77002
Phone:  (713) 223-2300
Fax:  (800) 404-3970
stephen.crain@bracewell.com
brad.benoit@bracewell.com

*Attorneys for Defendant Tenaska Marketing
Ventures*

Nicholas J. Boyle (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC  20004
Phone:  (202) 637-2339
Fax:  (202) 637-2201
nicholas.boyle@lw.com

Robert J. Malionek (*pro hac vice*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York  10020
Phone:  (212) 906-1816
Fax:  (212) 751-4864
robert.malionek@lw.com

*Attorneys for Defendant Rockpoint Gas
Storage, LLC*

/s/ *Connor Warden Brown*
William Perry Brandt #77842
Connor Warden Brown, #29423
SANDBERG PHOENIX & VON
GONTARD, PC
4600 Madison Avenue, Suite 1000
Kansas City, Missouri  64112
Phone:  (314) 779-1380
Fax:  (816) 627-5532
pbrandt@sandbergphoenix.com
cbrown@sandbergphoenix.com

Emiliano D. Delgado (*pro hac vice*)
John F. Bash, III (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
300 W. 6th Street, Suite 2010
Austin, Texas  78701
Phone:  (737) 667-6117
Fax:  (737) 667-6110
emilianodelgado@quinnemanuel.com
johnbash@quinnemanuel.com

/s/ *Matthew D. Moderson*
Matthew D. Moderson, #29521
STINSON LLP
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106
Phone:  (816) 691-2736
Fax:  (816) 412-8123
matt.moderson@stinson.com

Louis Layrisson (*pro hac vice*)
Liam O'Rourke (*pro hac vice*)
BAKER BOTTS
910 Louisiana Street
Houston, Texas 77002
Phone:  (713) 229-1421
Fax:  (713) 229-7721
louie.layrisson@bakerbotts.com
liam.orourke@bakerbotts.com

Michael Yuffee (*pro hac vice*)
BAKER BOTTS
700 K Street, NW
Washington, DC  20001
Phone:  (202) 639-7700
Fax:  (202) 639-7890
michael.yuffee@bakerbotts.com

*Attorneys for Defendant CIMA ENERGY LP
(formerly CIMA ENERGY, LTD.)*

/s/ *Casey O. Housley*
Casey O. Housley, #17665
SANDERS WARREN & RUSSELL, LLP
Compass Corporate Centre
11225 College Blvd., Suite 450
Overland Park, Kansas  66210
Phone:  (913) 234-6100
Fax:  (913) 234-6199
c.housley@swrllp.com

Sascha N. Rand (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10001
Phone:  (212) 849-7000
Fax:  (212) 849-7100
sascharand@quinnemanuel.com

*Attorneys for Defendant NextEra Energy
Marketing, LLC*

/s/ *Tristan L. Duncan*
Tristan L. Duncan, #70481; W.D.Mo. #39525
Holly P. Smith, #19984
Steven D. Soden, #70725; W.D.Mo. #41917
SHOOK, HARDY & BACON LLP
2555 Grand Boulevard
Kansas City, Missouri  64108
Phone:  (816) 474-6550
Fax:  (816) 421-5547
tlduncan@shb.com
hpsmith@shb.com
ssoden@shb.com

*Attorneys for Defendant Williams Energy
Resources, LLC*

David T. McDowell (*pro hac vice*)
Mary E. Green (*pro hac vice*)
William B. Thomas (*pro hac vice*)
MCDOWELL HETHERINGTON LLP
1001 Fannin, Suite 2400
Houston, Texas  77002
Phone:  (713) 337-5580
Fax:  (713) 337-8850
david.mcdowell@mhllp.com
mary.green@mhllp.com
william.thomas@mhllp.com

*Attorneys for Defendant Mercuria Energy
America, Inc.*

/s/ *Todd E. Shadid*
Todd E. Shadid, #16615
KLENDA AUSTERMAN LLC
301 North Main, Suite 1600
Wichita, Kansas  67202
Phone:  (316) 267-0331
Fax:  (316) 267-0333
tshadid@klendalaw.com

David E. Harrell, Jr. (*pro hac vice*)
Deanna Markowitz Willson (*pro hac vice*)
LOCKE LORD, LLP
600 Travis, Suite 2800
Houston, Texas  77002
Phone:  (713) 226-1467
Fax:  (713) 229-2582
dharrell@lockelord.com
deanna.willson@lockelord.com

*Attorneys for Defendant Spotlight Energy,
LLC*

/s/ *Michael G. Jones*
Michael G. Jones, #14511
William Rick Griffin, #21628
MARTIN PRINGLE OLIVER WALLACE &
BAUER, LLP
645 East Douglas, Suite 100
Wichita, Kansas  67202
Phone:  (316) 265-9311
Fax:  (316) 265-2955
mgjones@martinpringle.com
wrgriffin@martinpringle.com

Leah Nommensen (*pro hac vice*)
HUNTON ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas  77002
Phone:  (713) 220-3935
leahnommensen@huntonak.com

*Attorneys for Defendant Concord Energy
LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 31, 2024, I filed the foregoing with the clerk of the court by

using the CM/ECF system and sent via electronic transmission to all parties of record.

By: <u>/s/Alan R. Pfaff</u>
Alan R. Pfaff, #12949