```
1                IN THE UNITED STATES DISTRICT COURT
                         DISTRICT OF KANSAS
2

   IN RE WINTER STORM URI
3  NATURAL GAS LITIGATION             Case No. 24-1073

4  (This Document Relates to All Cases)

5

                    TRANSCRIPT OF PROCEEDINGS
6
           On the 16th day of October, 2024 came on to be
7  heard via Zoom the DISCOVERY CONFERENCE in the
   above-entitled and numbered cause before the HONORABLE
8  ANGEL D. MITCHELL, Magistrate Judge of the United States
   District Court for the District of Kansas, Sitting in
9  Kanas City.
           Proceedings recorded electronically via Zoom.
10         Transcript produced by mechanical stenography and
   computer.
11
   APPEARANCES
12
           Plaintiffs appeared by and through:
13         Mr. Jay Fowler
           Mr. Samuel Walenz
14         Mr. Jacob Schmidt
           Foulston Siefkin, LLP
15         1551 N. Waterfront Parkway, Suite 100
           Wichita, Kansas 67202
16
           Defendant BP Energy Company appeared by and
17 through:
           Ms. Amanda Davidoff
18         Sullivan & Cromwell, LLP - DC
           1700 New York Avenue, Suite 700
19         Washington, DC 20006

20         Mr. Richard Pepperman, II
           Sullivan & Crowell, LLP - NY
21         125 Broad Street
           New York, NY 10004
22
           Mr. Alan Pfaff
23         Wallace Saunders Austin Brown & Enochs
   Chartered - Wichita
24         200 W. Douglas, Suite 400
           Wichita, KS 67202
25
```

```
 1          Mr. Roman Panickar
            Wallace Saunders Austin Brown and Enochs
 2   Chartered - OP
            10111 W. 87th Street
 3          Overland Park, KS 66212

 4          Defendant Southwest Energy, L. P. appeared by and
     through:
 5          Mr. Kyle Mason
            White & Case, LLP - TX
 6          609 Main Street, Suite 2900
            Houston, TX 77002
 7
            Mr. Casey Jones
 8          Hinkle Law Firm
            1617 N. Waterfront Parkway, Suite 400
 9          Wichita, KS 67206

10          Defendant Macquarie Energy, LLC, appeared by and
     through:
11          Ms. Beatrice Franklin
            Susman Godfrey, LLP - NY
12          One Manhattan West, 50th Floor
            New York, NY 10001
13
            Ms. Megan Griffith
14          Susman Godfrey, LLP - Houston
            1000 Louisiana Street, Suite 5100
15          Houston, TX 77002

16          Defendant Rockpoint Gas Storage appeared by and
     through:
17          Mr. Nathan Saper
            Latham & Watkins, LLP - Los Angeles
18          355 S. Grand Ave, Suite 100
            Los Angeles, CA 90071
19
            Mr. Tyler Heffron
20          Woolf Garretson, LLC - Wichita
            2959 N. Rock Road, Suite 300
21          Wichita, KS 67226

22          Defendant ETC Marketing, Limited, appeared by and
     through:
23          Mr. Chris Conrad
            Weil, Gotshal & Manges, LLP - DC
24          2001 M Street NW, Suite 600
            Washington, DC 20036

25
```

10/16/2024    In re: Winter Storm Uri Natural Gas        3

```
 1          Mr. David Bengtson
            Stinson, LLP - Wichita
 2          1620 N. Waterfront Parkway, Suite 300
            Wichita, KS 67206
 3
            Defendant Tenaska Marketing Ventures appeared by
 4  and through:
            Mr. Bradley Benoit
 5          Bracewell LLP - Houston
            711 Louisiana Street, Suite 2300
 6          Houston, TX 77002

 7          Mr. Jeffrey Morris
            Berkowitz Oliver, LLLP - KCMO
 8          2600 Grand Boulevard, Suite 1200
            Kansas City, MO 64108
 9
            Defendant CIMA Energy, Limited appeared by and
10  through:
            Mr. Liam O'Rourke
11          Baker Botts, LLP - Houston
            One Shell Plaza
12          910 Louisiana
            Houston, TX 77002
13
            Mr. Matthew Moderson
14          Stinson, LLP - KC
            1201 Walnut Street, Suite 2900
15          Kansas City, MO 64106

16          Defendant Mercuria Energy America, Inc., appeared
    via Zoom and by and through:
17          Ms. Mary Green
            McDowell Hetherington, LLP
18          1001 Fannin, Suite 2400
            Houston, TX 77002
19
            Mr. Casey Housley
20          Sanders Warren & Russell, LLP - OP
            Compass Corporate Centre
21          11225 College Blvd., Suite 450
            Overland Park, KS 66210
22
            Defendant NextEra Energy Marketing, LLC, appeared
23  by and through:
            Mr. Luke Phillips
24          Quinn Emanuel Urquhart & Sullivan, LLP - TX
            300 W. 6th Street, Suite 2010
25          Austin, TX 78701
```

1      Defendant Williams Energy Resources, LLC, appeared
by and through:
2      Mr. Steve Soden
       Ms. Tristan Duncan
3      Shook, Hardy & Bacon, LLP - KC/Grand
       2555 Grand Boulevard
4      Kansas City, MO 64108

5      Defendant Concord Energy, LLC, appeared by and
through:
6      Ms. Leah Nommensen
       Hunton Andrews Kurth, LLP - Houston
7      600 Travis Street, Suite 4200
       Houston, TX 77002
8
       Mr. William Rick Griffin
9      Martin Pringle Oliver Wallace & Bauer, LLP -
Wichita
10     645 East Douglas, Suite 100
       Wichita, KS 67202
11
       Defendant Spotlight Energy appeared via by and
12 through:
       Ms. Deanna Wilson
13     Locke Lord, LLP - Houston
       600 Travis, Suite 2800
14     Houston, TX 77002

15

16

17

18

19

20

21

22

23

24

25

1          (The following proceedings were electronically

2   recorded and have been requested transcribed:)

3          THE COURT:  Good afternoon, everyone.  We're

4   here today for discovery conference in Case Number

5   24-1973 [sic], In re: Winter Storm Uri Natural Gas

6   litigation.

7          Will everyone please state their appearances for

8   the record.

9          And we need you, please, if we could have just one

10  lawyer from each group of parties list the appearances on

11  behalf of that party, and also at that time let me know

12  who will be doing the bulk of the speaking on behalf of

13  that party.

14         So with that, let me toss to the plaintiffs to

15  state their appearances first.

16         MR. FOWLER:  Your Honor, this is Jay Fowler.

17  I'm appearing with Sam Walenz, and Jacob Schmidt on

18  behalf of all the plaintiffs in all actions.

19         THE COURT:  Okay.

20         And, Mr. Fowler, will you be doing the bulk of the

21  speaking on behalf of the plaintiffs today?

22         MR. FOWLER:  Yes, I will.

23         THE COURT:  Okay.  And who do we have on behalf

24  of the BP defendants?

25         MS. DAVIDOFF:  Good morning, Your Honor.  Good

1 afternoon, Your Honor, Amanda Davidoff from Sullivan and

2 Cromwell.

3          And I'm here with my partner Rick Pepperman, and

4 my colleagues Allan Pfaff and Roman Panickar.

5          THE COURT:  All right.

6          And who do we have on behalf of Southwest?

7          MR. JONES:  Good afternoon, Your Honor.  Casey

8 Jones from Hinkle Law Firm.

9          Here with me, also, I have Kyle Mason.

10 He -- White and Case, sorry.

11          I will do the speaking on behalf of Southwest if

12 necessary.

13          THE COURT:  All right.  And on behalf of Tenaska

14 Marketing Ventures.

15          MR. BENOIT:  Good morning, Your Honor.

16          Brad Benoit from Bracewell.

17          I am also here with my colleague Jeff Morris, and

18 I will be speaking, if necessary, for Tenaska.

19          THE COURT:  All right.

20          And on behalf of Rockpoint?

21          MR. SAMPER:  Good afternoon, Your Honor.  Nathan

22 Saper, Latham and Watkins.

23          I'm joined by Tyler Heffron of Triplett Woolf

24 Garretson.  And I will be doing the bulk of the speaking

25 for Rockpoint to the extent necessary.

```
1              THE COURT:  All right.

2         And for Mercuria.

3              MS. GREEN:  Good afternoon, Your Honor.  Mary

4    Green with McDowell Hetherington and Casey Housely also

5    is here.

6         And I will be doing the speaking if necessary, so

7    --

8              THE COURT:  All right.

9         And CIMA Energy?

10             MR. MODERSON:  Good afternoon, Your Honor, this

11   is Matt Moderson for CIMA, and I'm joined also by Liam

12   O'Rourke.

13        And, if necessary, I'll be doing the speaking for

14   CIMA.

15             THE COURT:  All right.  And behalf of the

16   Macquarie defendants.

17             MS. FRANKLIN:  Good afternoon, Your Honor.

18   Beatrice Franklin and Meg Griffith from Susman Godfrey on

19   behalf of Macquarie.

20        And I will be doing the talking for Macquarie.

21             THE COURT:  All right.

22        And NextEra Energy?

23             MR. PHILLIPS:  Good afternoon, Your Honor.

24        Luke Phillips on behalf of NextEra Energy.  And

25   I'll do the talking if necessary, but I don't anticipate
```

1  that will be -- that we will be.

2        THE COURT:  Okay.

3     And on behalf of the Williams -- Williams.

4        MR. SODEN:  Good afternoon, Your Honor.

5     Steve Soden, Shook Hardy.

6     And I'm here with Tristan Duncan.  And I can speak

7  if necessary but, like others, I don't think it will be

8  necessary.

9        THE COURT:  Okay.

10    And on behalf of Spotlight.

11       MS. WILSON:  Good morning, Your Honor.

12    This is Deanna Wilson of Locke Lord for Spotlight.

13    I echo Mr. Soden's statement about others speaking

14 on our behalf.

15       THE COURT:  All right.

16    And on behalf of Concord.

17       MS. NOMMENSEN:  Good afternoon, Your Honor.

18    Leah Nommensen with Hunton Andrews Kurth.  And I

19 am joined by Rick Griffin of Martin Pringle.

20    And I will be speaking on behalf of Concord.

21       THE COURT:  All right.

22    And on behalf of ETC Marketing.

23       MR. CONRAD:  Good afternoon, Your Honor.  This

24 is Chris Conrad from Weil, Gotshal & Manges.

25    And I'm joined here today by David Bengston from

1  Stinson.

2          THE COURT:  All right.  I believe that takes

3  care of appearances.

4      Have -- I suspect the defendants have denominated

5  some lucky winner to speak on -- largely on their behalf.

6      Historically it's been Ms. Franklin.

7      Ms. Franklin, are you in the hot seat again today?

8          MS. FRANKLIN:  For my sins, I sure am.

9          THE COURT:  Okay.  Very good.

10     Well, if anyone else wants to chime in at some

11 point, please don't hesitate to let me know.  But, if

12 not, I'll generally toss to Ms. Franklin to speak on

13 behalf of the defendants.

14     All right.  With that, let me just state by way of

15 background, sort of where we're at from my perspective in

16 order to, hopefully, move the conversation along.

17     And that is that my chambers received an email on

18 October 8th from Jake Schmidt on behalf of plaintiffs

19 requesting a pre-motion conference with regard to

20 certain -- the defendants' objections to certain requests

21 for production, and I have since requested that the

22 parties provide -- I generally understand there is about

23 three areas of dispute, and I've since requested copies

24 of the request for production and I understand

25 that -- and so I have copies of those.

1    I am -- there are many copies that I am -- I've

2  gone through some of them but I'm not going to profess to

3  have gone through all of them because I'm going to

4  assume, just from the sampling that I looked at, that

5  they are conceptually similar across all of the

6  defendants.  And so the issues, I think, will be similar

7  but if I am misstating that as we go on, please let me

8  know.

9        But, in general, the defendants have objected to

10  producing documents related to the deliveries of natural

11  gas outside of Kansas, essentially on the grounds that

12  the -- any deliveries outside are not relevant nor

13  proportional to the needs of the case.  And examples of

14  these kinds of requests and responses are RFPs number 1,

15  3, 4 and 5.  That is issue number one, as I understand

16  it.

17        Issue number two being a request for production

18  number 24 by which plaintiffs seek complete production of

19  discovery made in response to other subpoenas and

20  administrative matters.

21        And, third, certain -- or at least one document

22  that Concord produced as a part of its Rule 26(a)(1)

23  Disclosures, and which I have a sampling of that

24  document.

25        And perhaps I mean I should say I have the whole

1  document.

2      And so with that, let me just say that the reason

3  that I typically have these pre-motion conferences, and

4  the general purpose of them, is to try to avoid motion

5  practice if possible.  It just tends to gobble up a whole

6  bunch of time and resources and potentially derails the

7  case schedule as well, and so I'm not going to foist a

8  ruling upon anyone today but, rather, give you a little

9  bit of preliminary feedback so that you all can decide if

10  you want to meet and confer further about the issue,

11  perhaps resolve it on a call, or set deadlines to move

12  the resolution of the matter forward, if it sounds like

13  it's the type of thing that is going to require formal

14  motion practice.

15      And so I often find that with a little bit of

16  preliminary feedback on my end, that these issues can get

17  resolved and save everyone, you know, the time and

18  expense.  Not that -- not that you all need a lot of

19  saving in terms of expense in this case, there is plenty

20  of you to fight this good fight that I am sure is worth

21  many, many, many millions but, nonetheless, it does tend

22  to bog down the case if you all are wondering how a

23  particular issue is going to play out.  And so if we can

24  provide a more efficient way to resolve the issue, that's

25  what I am here to do.

1            And so, with that, let me just provide a brief

2    understanding of my understanding of the first issue, and

3    that is whether or not the defendants need to produce

4    documents related to deliveries of natural gas outside of

5    Kansas.  And to that end, at a high level, requests for

6    productions number one are related to, essentially, the

7    deliveries to the -- what I would call the intermediaries

8    in each case.  And the defendants have said, yeah, we'll

9    produce.

10           So, for example, for BP, it's natural gas and

11   nominated -- natural gas nominated by Black Hills and

12   designated and scheduled for the accounts of purchase of

13   natural gas from BP to Black Hills in February of 2021,

14   and the defendants have objected to producing documents

15   beyond amounts nominated for delivery in Kansas.  And,

16   again, that's to Black Hills.

17           And requests number three, four and -- three and

18   four are similar in that they are tethered to sales of

19   natural gas from BP to Black Hills.

20           Number three -- or, I'm sorry, number two is

21   tethered to the relevant Platts locations, which is a

22   defined term that I'll get to in a minute.

23           And that is all documents that refer to or mention

24   deals that you reported to the daily price survey Platts

25   location for the relevant -- quote, relevant, quote,

1  Platts locations for essentially January through March.

2       And then five is a purchase of natural gas to

3  customers in Kansas and Oklahoma.

4       And so I understand the defendants' objection is

5  essentially to producing anything outside of Kansas in

6  response to those and presumably similar requests, but I

7  also understand from the plaintiffs' perspective that

8  they're not asking for -- for -- for sales and deliveries

9  everywhere but, rather, that they have tethered their

10 requests to either documents from the particular

11 defendant or defendant groups, to the particular

12 intermediary in a given case, and/or the relevant Platts

13 locations, or Kansas and Oklahoma.

14      And I also have from -- Mr. Fowler sent a copy of

15 the definition of relevant Platts locations in the

16 plaintiffs' first request for production.  And,

17 essentially, the relevant Platts location refers to

18 following locations, and then there is a link to the *S&P*

19 *Global Platts Methodology and Specification Guides*, which

20 I pulled.

21      And so I generally understand that these are

22 essentially the mid-continent locations.

23      There's one that appears to be outside of that

24 but, in general, they're tied to the mid-continent Platts

25 locations.  And so that's my high-level understanding of

1  the first issue.  And so let's start with that one first.

2        And, Mr. Fowler, why don't you let me know where

3  you all stand on that and if there is any way I can help

4  today.

5            MR. FOWLER:  Okay, Your Honor, thank you for

6  that.

7        In a very brief summary, this market is covered by

8  pipelines, whether it be Southern Star, Panhandle

9  Eastern, or others, and that overlays the geographic

10  region of primarily Oklahoma and Kansas.  It goes in to

11  Colorado and Wyoming, for example, and it is one

12  marketplace, if you will.

13        And so the gas is delivered -- 43 percent or 42

14  percent of the gas going to KGS, for example, comes from

15  a delivery point initially nominated outside of the State

16  of Kansas.  But it is all being delivered to Kansas, to

17  the distributors, and then passed through to the

18  consumers and the distributors, of course, take the

19  position that the pricing is all based on the cost of the

20  gas they acquired and they don't have much to say about

21  it.

22        And so the first point of that is that the

23  relevant marketplace is this, for lack of a better term,

24  mid-Kansas kind of market.  And that is gas going into a

25  pipeline in one location and coming out of another.

1           And if you look at maps -- and we haven't provided

2    you maps, we haven't done any briefing, but if you look

3    at the map, you can see that gas goes in and comes out

4    and at various point they can come in and come out, but

5    its ultimate delivery in this case is Kansas.  And so to

6    some extent the district judge is going to have to decide

7    the question about whether liability for KCPPA for

8    this -- I'm getting a little feedback, I don't know

9    whether anybody else is or not?

10          But liability under the KCPPA but the price of the

11   gas is determined based on various indexes or other

12   charges, and that's why we relevant -- we identify the

13   relevant Platts location, it is put into the system, and

14   sold in Kansas.

15          But there is also a second component as to why

16   this information is very relevant and that is the market

17   conduct issue.  What we have discovered by the limited

18   discovery we've been able to do to-date, and by

19   subpoenas, is that one supplier would not deliver KGS on

20   a base load contract, and then deliver under a spot

21   contract to another distributor.

22          And if you look at the scope of the market, that

23   includes Oklahoma and Kansas, for example, you'll see a

24   cut in Kansas, and delivery in Oklahoma, and vice versa.

25   And that goes to the unconscionable pricing issue and it

1  goes to what, in our meet and confers we refer to as the

2  shuffle.  Which is one entity, supplier cuts, and sales

3  on the spot market at a different place and vice versa,

4  allowing the price of the gas that ultimately is

5  delivered to the consumer to be substantially increased.

6        And so that's why it is relevant as a matter of

7  direct liability, if you will, because this is gas to

8  a -- that's ultimately sold to the consumer.

9        I don't know that you want to get into legal

10  argument or not but the *Stair versus Gaylord* case is one

11  we've cited that says a supplier from outside the state

12  can still be liable if the product is sold in Kansas to a

13  Kansas consumer down the chain.  And so that's our

14  position on that issue.

15        Some of the defendants have provided partial

16  answers already that show this but none of them have

17  provided, in our view, complete answers on the documents

18  that relate to this geographic scope issue.

19        THE COURT:  Okay thank you, Mr. Fowler.

20        Ms. Franklin, tell me the defendant -- just and

21  really I'm -- I want to get into more as a practical

22  matter here, why not just produce those documents?

23        MS. FRANKLIN:  A couple of reasons, Your Honor.

24        So, first, as Mr. Fowler acknowledged, the

25  question whether the KCPA applies extraterritorially is

1  squarely before Judge Crabtree on the motions to dismiss.

2      We obviously think we have the better of that

3  argument because case law is uniform in saying that the

4  KCPA does not apply to transactions outside of Kansas,

5  including in a case from this year by Judge Crabtree, so

6  we expect to prevail on that argument. And if we do, it

7  will drastically reduce the number of transactions that

8  are purportedly relevant to this case and will reduce the

9  amount of discovery that is relevant to this case.

10     Plaintiffs have never articulated to us why they

11  need this discovery now. They have repeatedly

12  represented both to this Court and to us in meet and

13  confers that they don't need fact discovery for class

14  certification. They have never told us why they need

15  this discovery for class certification.

16     And so our -- you know, first point is one of

17  timing. What we should do is we should wait and see how

18  Judge Crabtree rules on this extraterritoriality question

19  and then determine whether any non-Kansas transaction

20  discovery will be relevant because I can imagine a world,

21  for example, in which, you know, Judge Crabtree says, No,

22  non-Kansas transactions are relevant.

23     He could say some are relevant if they meet, you

24  know, certain criteria, or he could say all of them are

25  relevant. And the way that he decides that question will

1  inform the relevance of this additional discovery.

2        So that's, you know, the first point, which is one

3  of timing.  You know, there's simply no prejudice to

4  plaintiffs for waiting on this, whereas for defendants

5  there would be a tremendous burden in collecting and

6  producing this information, and there's no reason for us

7  to incur that cost and expense if these documents will

8  ultimately be irrelevant to the case.

9        THE COURT:  But -- thank you.

10       Ms. Franklin, I just have one follow-up issue, on

11  that on that particular issue of one of timing.

12       What kind of lag time are we talking about if,

13  let's say Judge Crabtree's order comes down, and

14  depending on the interpretation of that order, let's

15  say -- let's just, what he says, let's just say the full

16  scope of discovery is relevant.

17       What kind of time frame are we talking about for

18  the defendant to produce this additional discovery at

19  that point?

20       MS. FRANKLIN:  I don't think I can give a

21  confident, precise answer to that question because it

22  really does depend on what is going to be relevant

23  because --

24       THE COURT:  Let's say -- let's say all of it.

25  Let's say all of it is relevant.

1          MS. FRANKLIN:  You know --

2          THE COURT:  Everything that you are asking for.

3          MS. FRANKLIN:  Well, but -- but the question is

4   -- so there are a number of RFPs that go to the issue, in

5   addition to the ones that the plaintiffs and Your Honor

6   identified.  You know, some of these requests are seeking

7   documents referring to any transaction that happened on

8   these pipelines.

9          You know, there are six or eight pipelines,

10  depending on which set of requests we're talking about.

11  So if plaintiffs are truly going to insist that we

12  produce every single document related to every

13  transaction on these pipelines which cover numerous

14  states beyond just Oklahoma and Kansas, you know, even if

15  a sophisticated defendant like Macquarie, I would imagine

16  that, you know, it would take, you know, weeks to put

17  that together.

18          I would hope that we would be able to come up with

19  a more reasonable scope of production but, again, in

20  order to do that, I think we need to have guidance from

21  Judge Crabtree on what specifically is going to be the

22  relevance of these documents.

23          Because if Judge Crabtree says, well, okay, you

24  know, transactions at the Kansas border, specifically

25  with these distributors, that's relevant so, you know,

1  produce communications related to those specific pools on

2  a different pipeline, for example.  That, you know, I'm

3  sure we could do.

4       Well, again, speaking just for Macquarie here, I

5  am sure we could do that in a matter of weeks.  And, you

6  know, Your Honor will recall that there are 90 days, I

7  believe, for the -- either the substantial completion or

8  the -- I know that there's --

9       THE COURT:  It is --

10       MS. FRANKLIN:  There is at least 90 days of

11  discovery after we get a ruling from Judge Crabtree on

12  the motion to dismiss.  So there is no reason that this

13  discovery cannot be completed in that time period.

14       THE COURT:  Gotcha.  Thank you.

15       Okay.  Please move on to your next point.

16       I just wanted to make sure I understood that as a

17  practical matter.  Okay.

18       MS. FRANKLIN:  Sure.

19       So the next point is that whether or not certain

20  transactions outside of Kansas are ultimately held to be

21  relevant, what plaintiffs are seeking is just

22  tremendously overbroad.

23       Again, they're seeking discovery into what seems

24  to be every transaction on six or eight, or more,

25  pipelines which go through five, six, seven states across

1   the country.  Most of those pipelines have few, if any,

2   interconnects into Southern Star at Kansas.

3           Certainly, you know, Macquarie cannot transport

4   gas from, you know, one pipeline in Texas all the way

5   through these other interconnects into Southern Star at a

6   time of market disruption, like the Winter Storm.

7           You know, I contest Mr. Fowler's assertion that

8   this is all one marketplace.  Very plainly it's not all

9   one marketplace, that is why Platts has different indices

10  that have different market prices that are heavily

11  location based.  And, yes, of course, several locations

12  did see price increases during the winter storm because

13  there was, you know, a widespread storm affecting all of

14  them.

15          But it is just -- it is I think an inaccurate

16  characterization of the marketplace to say that it's just

17  gas shuffling from one location to another.

18          No.  The interconnects are very precise.

19  Transportation was very limited.  Storage was very

20  limited, and we really have to parse it on a location by

21  location basis to determine what would be relevant by

22  location.  I don't just mean a pipeline at-large.  I

23  mean, okay, this specific pool, you know, in a

24  neighboring state.

25          So, again, those questions are tough questions.

1  They are questions that I would hope the parties could

2  work out if Judge Crabtree rules that some non-Kansas

3  transactions are relevant, but that is going to be a

4  difficult process and I think we would need to have

5  guidance from Judge Crabtree on that.

6        And the final point that I wanted to flag, which

7  is related to this one, is that this issue came before

8  Judge Luedke in state court when Macquarie litigated this

9  issue with the Kansas Attorney General.  Kansas Attorney

10 General obviously has a very broad investigative subpoena

11 power, made this same argument that they were entitled to

12 discovery from all of the other pipelines in the Mid-Con

13 region because it's an interconnected marketplace and so

14 on, and Judge Luedke rejected that argument for this

15 reason.

16        Saying, no, you're talking about -- your case is

17 about -- or your purported case is about conduct on

18 Southern Star.  You're entitled to discovery related to

19 Southern Star.  And if you can make a showing of specific

20 relevance as to other neighboring, you know, transactions

21 maybe we would go there.

22        But it is just it's inaccurate to say that while

23 gas moves around, therefore, we're entitled to all this

24 information related to every transaction, you know, which

25 would be thousands, if not more, transactions, based on

1  the number of defendants here.  And the spread of our

2  operations.

3      But just to end where I began, there is no reason

4  to decide this issue now because we can further meet and

5  confer on this once we have a ruling on the motions to

6  dismiss in hand.

7          THE COURT:  Okay.  Thank you, Ms. Franklin.

8      Mr. Fowler, the -- I think where I'm -- my mind is

9  headed on this issue at this time is that it might make

10 some sense -- this is probably an issue that I suspect is

11 going to go to motion practice and if we're going to go

12 to -- if we're going have to go to all that time and

13 effort, why not wait until we have the benefit of Judge

14 Crabtree's ruling on these issues, my inclination would

15 be to probably set a deadline for filing only motion to

16 compel on this issue, maybe, say, 14 days after he issues

17 a ruling on the pending motions to dismiss.  That would

18 give you all about a week to meet and confer.

19      I know that's ambitious but, you know, if we hold

20 up on me deciding this issue or getting this issue before

21 the Court until Judge Crabtree's rulings, then at that

22 point I am going to want to move on it pretty quickly.

23      And so what would your thoughts be about that in

24 terms of a plan of attack on this issue, Mr. Fowler?

25          MR. FOWLER:  Well, Your Honor, we have been

1  concerned about getting ready to prepare and try our case

2  and there's a lot of data to consume and you should know

3  by way of background in this discussion, there were two

4  other issues that we haven't presented to Your Honor.

5          One relates to profitability, and the other

6  relates to the time frame of our request.  And the

7  parties entered into an understanding, which we call a

8  non-waiver agreement, that we would reserve those issues,

9  with the Court's consent, until later, in light of the

10  anticipated ruling by Judge Crabtree.

11          We decided then that on these two issues, that --

12  the what I call the cone discovery, and then the February

13  20, 2021, that it was so critical to getting -- to

14  getting the base documents -- to getting the base

15  documents, we would like to go forward.

16          Now I understand the Court's position on that and

17  we do think this is an issue that probably merits some

18  good discussion and briefing so I -- I sort of respect

19  that thought.

20          But the Court should understand that we have been

21  struggling to accommodate this notion of keeping

22  discovery more limited now with the notion that it would

23  be expanded later based on the rulings by Judge Crabtree.

24          THE COURT:  So what I am hearing you say,

25  Mr. Fowler, is you feel like these are pretty threshold

1  documents that you need to get rolling on in order to be

2  able to properly prepare your case and not wait on that

3  ruling from Judge Crabtree, is that correct?

4        MR. FOWLER:  Right.

5        These are very base documents that we need for

6  market analysis by experts and things of that nature, and

7  it is a kind -- I do agree, it is a complicated case

8  involving loss of transactions and so it will take time

9  and we want to make sure we were proceeding

10 appropriately.

11        THE COURT:  Okay.  Okay.  Very good.  All right.

12        Well, I will circle back then at the close of this

13 conversation and we'll set some briefing schedules on

14 that motion if that's something you are ready proceed

15 with at this point, Mr. Fowler.

16        I don't know how that is going to play out in

17 terms of my thinking but I -- it is something that

18 strikes me as an important issue to everyone and one that

19 is going to cause a lot of angst one way or another and

20 so we might as well get rolling on that briefing at this

21 point while you all are waiting that ruling from Judge

22 Crabtree.

23        Honestly, my -- how quickly I issue a decision may

24 or may not be informed by, you know, who knows when Judge

25 Crabtree is going to issue a decision so it may or not

1  may be, but we can at least get the wheels in motion to

2  get that issue playing out sooner rather later.

3        Okay.  Think that takes care of issue number one,

4  Mr. Fowler, is that correct?

5            MR. FOWLER:  Yes.

6            THE COURT:  Okay.  Ms. Franklin, anything

7  further on that issue?

8            MS. FRANKLIN:  No, Your Honor, thank you.

9            THE COURT:  Okay.  Okay.

10       Then the next issue would be production of

11  discovery made in response to other subpoenas or

12  administrative matters, and that relates to RFP number

13  24.

14       And it does strike me -- I've looked at that

15  request for production, and it does strike me as probably

16  being improper as -- categorically as it is currently

17  phrased.

18       But, Mr. Fowler, why don't you let me know where

19  you all stand on that issue at this point.

20       And let me just state for the record that it is --

21  that request seeks all documents related to any subpoenas

22  or other discovery requests regarding your natural gas

23  sales during Winter Storm Uri from any governmental

24  entity, including but not limited to the Kansas Attorney

25  General and its agent.

1      This request includes the subpoenas, responses and

2  documents produced.

3      And so I know it always seemed the -- those kind

4  of discovery requests quite a lot, sometimes it seems

5  easy to flip a trigger and make that happen but

6  oftentimes it's not quite that easy.

7      And so, Mr. Fowler, have you all narrowed this

8  request at any point or had any further discussions about

9  this?

10      I just don't have a sense of what kind of volume

11  of documents are we talking about here?

12      MR. FOWLER:  We have had discussions.  There are

13  a few of the defendants -- several of the defendants

14  identified they did not have any subpoena responses so we

15  can move those aside.

16      There are other defendants who very clearly has

17  subpoena responses.

18      We, quite frankly -- maybe it's narrowing in its

19  scope but we, quite frankly, believe this is a very easy

20  request to respond if the defendant who made a subpoena

21  response supplies the documents, in other words, their

22  response to the AG or that governmental agency, that is

23  satisfactory to us.

24      And it was your understanding and belief that in

25  many instances that those have already been packaged

1  together and Bates numbered in connection with the prior

2  responses so that it would be very easy to accomplish.

3          At least one of the defendants has supplied us

4  with at least a portion of a response to the Kansas AG

5  subpoena so we -- you know, we kind of know, you know,

6  what's there and in a sense as to one defendant.

7          But we view this perhaps more narrowly construed

8  as, Give us response you gave to the investigating

9  governmental entity.  That's what we want.

10          And we believe there is no burden associated with

11  that at all because it is probably already pretty

12  packaged.

13          THE COURT:  So, Mr. Fowler, as I look at this

14  request, though, it starts off as all documents related

15  to any subpoenas, or other discovery requests regarding

16  your natural gas sales during Winter Storm Uri.

17          Am I hearing you say that you -- that the

18  plaintiffs would be satisfied with the responses to any

19  government subpoenas?

20          MR. FOWLER:  Yes.

21          THE COURT:  Okay.

22          Ms. Franklin, narrowed as such, what is the

23  defendants' response to producing that subset of

24  responsive documents?

25          MS. FRANKLIN:  So, just to be clear, I

1  understand the response to the subpoenas to be the

2  documents that were produced, not just written responses

3  or correspondence, and assuming that that's the correct

4  understanding, the test is not one of burden, the test is

5  one of relevance.

6         Courts pretty much uniformly hold that requests

7  like this for clone discovery, even when it is for

8  analogous or parallel civil litigation, those kinds of

9  requests are improper and the person seeking the

10 discovery needs to make a showing of specific relevance.

11        And the Court will analyze, you know, whether the

12 parties and the other litigation were identical, whether

13 the issues were identical, the time period, the statutes

14 involved, and so on.

15        Here, plaintiffs have never made any such showing.

16 They have simply made the argument they're making here

17 as, well, you can just press a button to produce the

18 documents, so we're entitled to the documents.  And

19 that's just simply not what precedent holds.

20        They never pointed us to any authority to support

21 the position.  The two cases they've cited to us actually

22 did not, in fact, allow production of full clone

23 discovery for exactly this reason.

24        There needs to be a showing of relevance. And the

25 reason that that's important here is because what

1 plaintiffs are seeking are not just documents from

2 another adversarial litigation, which is improper in and

3 of itself as these cases show, they're asking for full

4 reproduction of documents that were produced in response

5 to a governmental and regulatory investigations.

6        And the reason that is important is because

7 investigative authority is so broad.  You know, whether

8 it's the Kansas AG, or FERC, or some other governmental

9 agency that was conducting these investigations, they

10 have mandate from -- from the government to go out and

11 investigate and to ask for documents that are going to

12 touch on issues that will necessarily be broader than

13 those that end up in litigation.

14        And so parties responding to those requests may

15 very well be more of an open book and, you know, produce

16 documents for broader time periods, for more locations

17 for, you know, other entities under their control, that

18 are not going to end up in litigation with that, you

19 know, regulatory entity and, certainly, would not end up

20 in litigation with a civil litigant.

21        It's important to keep that distinction in mind

22 because there would be a tremendously problematic

23 chilling effect if courts authorized these kinds of

24 requests because. You know, recipients of governmental

25 subpoenas would be much less likely to cooperate with

1  those investigations if they thought they were going to

2  be forced to just press a button and produce the

3  documents that they produced to the governmental entity,

4  if they ended up in some civil litigation that was, you

5  know, tangentially but not perfectly related to the

6  subject in the investigation.

7       So that is the defendants' concern here is that

8  plaintiffs are, essentially, asking us to just produce

9  documents they haven't necessarily asked, for documents

10  that aren't responsive to the issues in this case,

11  documents that they wouldn't be entitled to had

12  defendants not cooperated with these governmental

13  investigations.

14       And so defendants believe that that's

15  inappropriate and there is a substantial body of case law

16  supporting our position.

17       THE COURT:  So, Ms. Franklin, I understand your

18  point about clone discovery requests and whatnot and that

19  there has to be a threshold shown.  You know, that there

20  needs to be a showing of relevance as to their

21  litigation, administrative matters and whatnot.

22       But it strikes me here that at least some of the

23  defendants would have some document -- and but, so two

24  points on that.  Number one, this request for production

25  is specifically tethered to natural gas sales during

1  Winter Storm Uri and so you're already sort of in the

2  ball park on relevance.

3          And then, as I recall, there were a number of

4  documents cited in the plaintiffs' complaint or briefing,

5  or something like that, that were actually -- some of the

6  defendants, the documents that they had submitted to the

7  Kansas Attorney General during its investigation.  And so

8  surely those are relevant.

9          And I'm not saying that every document from those

10  other litigations is relevant in -- in administrative

11  matters and investigations and whatnot, and I understand

12  that there may have been a lot of them.  But it strikes

13  me that there probably are some that are sufficiently

14  relevant here to warrant some production of responses to

15  some of these administrative matters, and I think the

16  risk that the defendants are running here is if they

17  don't take it upon themselves to define the scope of what

18  they believe is relevant and fair here, they could get a

19  court order saying, Produce a whole lot of it.

20          And so it strikes me that it would probably

21  behoove the defendants to say, Okay, well, this

22  investigation as to Winter Storm Uri was close enough to

23  -- you know, to the allegations in this case that we're

24  going to produce the documents that we have produced to

25  the Kansas Attorney General.  Probably at least that.  I

1  don't know because I'm not familiar, I'm just, again,

2  this is just me sort of off-the-cuff trying to help you

3  all think of maybe a little bit more efficient way to

4  work through this and productive way to work through it

5  because I doubt Mr. Fowler and his team want a whole

6  bunch of documents that are too far afield, either.

7       But I get why they would want, at a bear minimum,

8  some of the statements and representations and whatnot

9  that the defendants may have made in response to

10  subpoenas from the Kansas Attorney General's office about

11  natural -- about their natural gas sales during Winter

12  Storm Uri.

13       And so it strikes me that there is some subset of

14  this request for production that is probably fair game

15  here.  I'm not saying what that looks like but I think

16  you all would probably be well-served, from the

17  defendants' perspective, to try to figure out

18  which -- what subset of that that is and maybe not fight

19  about that subset at least.

20       Thoughts on that, Ms. Franklin?

21        MS. FRANKLIN:  So, Your Honor, I apologize if

22  our position was unclear from what I said before.

23       We have already done that.

24       You know, defendants -- you know, Macquarie, for

25  example, we have already produced a substantial subset of

1  the documents that we produced to the Kansas AG to the

2  plaintiffs.  To the extent that they are, you know,

3  related to our Kansas transactions, to the extent that

4  they are -- that they are responsive to plaintiffs' other

5  requests, to the extent that they do not go to issues

6  that are otherwise in dispute between the parties, you

7  know, for example, non-Kansas transactions, we have

8  produced those documents and my understanding is that

9  other defendants have taken similar positions.

10       So the only question is whether plaintiffs are

11  entitled to full reproduction of any documents we

12  produced to any governmental authority related to Winter

13  Storm Uri, not just limited to Kansas, for example.  And

14  that is the line the defendants are holding.  Because our

15  position is that if they are responsive to other

16  requests, if they're relevant to this case, we are

17  producing them.  Yes, we acknowledge that.  Those are

18  proper subjects of discovery.

19       But where we draw the line is we're not going to

20  produce documents that plaintiffs wouldn't otherwise be

21  entitled to simply because we produced them as part of

22  broader governmental investigations.

23            THE COURT:  Okay.

24       Mr. Fowler, any further thoughts on that issue?

25            MR. FOWLER:  Well, Your Honor, the AG subpoena,

1  which is really what we were talking about, was very

2  specifically tailored to Winter Storm Uri and the Kansas

3  Consumer Protection Act and we think that their response,

4  in that narrowed and very precise context, needs to be

5  whatever they produced to the AG.

6          THE COURT:  Okay.  Okay.

7      All right.  Well, we'll set that up for motion

8  practice, too.

9      And then let me turn to the third issue, only

10 because I am going to have a hard stop at 2 o'clock, and

11 I think this is -- I think I can get to this one fairly

12 quickly.

13     And this relates to documents that Concord

14 produced to Ms. Nommensen?  Nommensen?

15         MS. NOMMENSEN:  Nommensen, Your Honor.

16         THE COURT:  Okay.  And I have a copy of that.

17 One of -- that's a Concord Bates -- the document labled

18 Concord Bates labeled Concord 1 and 2, and I'm looking at

19 that.

20     And there are what's a Net Out statement with a

21 bill to Symmetry Energy Solutions with, looks like some

22 Southern Star pricing from Winter Storm Uri time frame on

23 it.  But everything else on the document is blacked out.

24     And, Ms. Nommensen, I don't know if you're

25 familiar with this or not but I do have some written

1  opinions out there on this specific issue in terms of the

2  ability to redact -- you're -- you're nodding -- in terms

3  of the right or ability to redact particular information

4  from otherwise relevant documents.

5       In particular, the *Ritchie versus Wal-Mart* case,

6  2020 Westlaw 5369392 from September 8th of 2020, also Coe

7  versus Cross-lines Retirement Center, 2022 Westlaw

8  4355286, D.Kan from September 20th 2022.  In both of

9  those instances I denied motions for protective order

10 allowing redactions.

11       There is one case where I did grant a motion for

12 protective order allowing what I recall to be fairly

13 minimal redactions on information that was not relevant

14 to the case.  And that was *Ad Astra Recovery Services,*

15 *Inc. versus Heath*, 2020 Westlaw 5057482, D.Kan September

16 2nd of 2020.

17       And so those cases pretty much set out my views on

18 whether or not such redactions are allowed and so let me

19 just say, as I look at this particular document, it

20 strikes me as being pretty heavily redacted, perhaps to

21 the point that it is -- provides -- deprives the other

22 side of context.

23       And so, Ms. Nommensen, and I understand the

24 objection here is probably, well, this is super-duper

25 hyper confidential information, my client doesn't want to

1  share it, yada, yada, yada.

2      My response to that is there is a protective order

3  in the case and you've labeled this attorney's eyes only

4  - highly confidential.

5      So with all of that said, Ms. Nommensen, where do

6  you all stand on that issue today in terms of are you

7  standing by the redactions and wanting to file a motion

8  for protective order here?

9      MS. NOMMENSEN:  Yes, Your Honor.  Concord

10  believes that the redacted information is exactly the

11  type of information that was redacted in Your Honor's

12  opinion in *Ad Astra*.

13      Concord redacted nonresponsive, highly

14  confidential trade information that Concord contends is

15  protected trade secrets that are not relevant to this

16  dispute.

17      So in this context, I first want to address

18  responsiveness.  The only document request that Concord

19  has received from plaintiffs is a document request that

20  seeks the Concord's Rule 26 Disclosure.

21      Concord identified its Net Out Statement with

22  Symmetry in its Rule 26 Disclosures as a document that it

23  may rely on in support of its defense.  But as Your Honor

24  is aware, this case concerns the Kansas Consumer

25  Protection Act and so what plaintiffs need to establish

1  is a consumer transaction with Concord.  And Concord

2  tends -- intends to rely on in support of its defenses

3  transactions with its commercial counter-party Symmetry

4  in Kansas.

5        What Concord has redacted in this Net Out

6  Statement are its purchases and sales with Symmetry

7  outside of the State of Kansas and Concord is willing to

8  submit to Your Honor an in camera review of this document

9  so that Your Honor can see that the transactions that

10  have been redacted are outside of the State of Kansas.

11        And this Net Out Statement constitutes Concord's

12  protected trade secrets because it delineates all of

13  Concord's transactions in the country across the entire

14  United States by specific pipeline, flow dates, volume

15  amount, and price.

16        And which pipelines Concord conducts its business

17  on, and the flow volume, that type of information is not

18  [inaudible].  That is Concord's protected trade secrets

19  that it believes that if this information were to fall

20  into the hands of its competitors, there -- its

21  competitors would be capable of replicating Concord's

22  business with Symmetry and competing with Symmetry -- or

23  competing with Concord for Symmetry -- Symmetry's

24  business on these specific pipelines.

25        And that type of harm, Your Honor, is real here

1  because plaintiffs have sued all of Concord's direct

2  competitors in the natural gas trading industry.  So

3  while Concord certainly appreciates that it cannot just

4  redact irrelevant or nonresponsive information, this is a

5  little bit different because it is nonresponsive to the

6  document requests at issue and it is irrelevant to this

7  dispute.

8          And I'd also like to point out that Concord is a

9  little bit more uniquely situated than the other

10  defendants in this case because there is no specific

11  allegation in plaintiffs' amended complaint that Concord

12  violated the Kansas Consumer Protection Act.

13          There is no identified transaction by Concord.

14  The only general allegations in the amended complaint as

15  to Concord is that Concord, with the other Rice

16  defendants, conducted business with Symmetry, and then

17  that natural gas was then resold to Atmos and residential

18  customers.

19          There is no identified transaction by Concord that

20  there -- this specific transaction was optionable or this

21  specific transaction was sold to plaintiffs and violates

22  the Kansas Consumer Protection Act.

23          So the relevance is even more attenuated when it

24  comes to Concord.  And Concord believes that Your Honor's

25  opinion in *Ad Astra* is directly on point in this case.

1    We have nonresponsive information that is not

2    relevant to this dispute and it is Concord's highly

3    protected trade secrets that, if disclosed to its

4    competitors, there is a real risk in this case.

5    And Your Honor did point out that there is a

6    protective order in this case and that there is an

7    attorneys' eyes only designation but the threshold,

8    first, is that the information must be responsive to a

9    document request and it must be relevant.  Then the AEO

10   designation is a good tool, but the AEO designation does

11   not automatically make nonresponsive, irrelevant trade

12   secret information responsive and relevant.

13        THE COURT:  All right.  Thank you, Ms.

14   Nommensen.

15        Mr. Fowler, what say you as to why you need an

16   unredacted version of this document?

17        MR. FOWLER:  Well, first of all, we know from

18   this document one thing.

19        We know that Concord sold to Symmetry, who was the

20   buying agent for Atmos, so they were acting as the

21   middleman, if you will, for Atmos Gas, that appears to

22   be, under our theory, priced at an unconscienable

23   amounts, as high as $3.30 an MMBtu.  So we know that.

24        One of the things that we need to be able to

25   assess is how these companies were handling the pricing

1  of their gas at various places because, you know, you

2  know conscienability weighs that.

3          And so when we get a document like this, we see

4  that Concord is selling to Symmetry, apparently during

5  the month of February, which is the month in question, an

6  unspecified amount of natural gas, and they don't even

7  tell us the location.  But the location could be very

8  relevant in our analysis because if they are selling gas

9  at a different price from a same or a similar location

10 where the gas supplies are coming from the same pool, if

11 you will, that's going to be a factor we're going to use

12 in advancing our lawsuit.

13         And so, Your Honor's cases, I think, and not only

14 Your Honor but a number of the district judges in our

15 district, as well, have said that if you have a document

16 that is not of evidentiary value, the party on the

17 opposite side gets to see the entirety of the document

18 because, otherwise, its -- its credibility is called into

19 question.

20         It is -- it is obviously prepared and produced and

21 delivered in the context of this transaction.  Now maybe

22 it has information that's not relevant on it, but we

23 can't evaluate that based on these redactions and we

24 normally get to make that kind of review, particularly

25 when they are identifying this as an important document

1  to their defense.  And so that's why.

2      And it is AEO.  And -- and the AEO carries a lot

3  of protection.  And trade secret information gets

4  produced in an AEO context routinely.  We rely upon the

5  Court and the lawyers to honor that.

6      And I would expect everybody would do that here as

7  well.

8          THE COURT:  Okay.  Okay.  Well, I'm satisfied

9  that y'all have bottomed out on this issue and we'll set

10  briefing schedules for all of the aforementioned issues.

11      I appreciate everyone's good and thoughtful

12  attention to these issues and I am satisfied that y'all

13  have adequately met and conferred, including with my

14  involvement, and not been able to resolve these issues.

15      And so with that, Mr. Fowler, when would your

16  team of -- what I'd like to do is set a motion -- a

17  deadline for motions to compel on issues number one and

18  two, and -- and a deadline for Concord to file a motion

19  for protective order to kick off that briefing on issue

20  number three.

21      And so, in other words, you're going to need to

22  file a protective order to allow you to make these

23  redactions that you've made.

24      And when do you, Ms. Nommensen, I am going to want

25  you all to submit the document in camera for my review.

1  You can coordinate with my courtroom deputy Audra on how

2  to do that.

3       But when you file that motion, do submit the

4  document in camera so that I can see what's been

5  redacted.

6            MS. NOMMENSEN:  Yes, ma'am.

7            THE COURT:  And so with that, Mr. Fowler, what

8  kind of timing works for you in terms of filing a motion

9  to compel?

10       Maybe a couple weeks?

11       A week?

12       What are you thinking.

13            MR. FOWLER:  Just because of some other matters

14  we'd like to have 21 days.

15            THE COURT:  All right.  So how about November

16  6th?

17            MR. FOWLER:  That would be fine.

18            THE COURT:  All right.

19       And then how long would the -- how many pages do

20  you think you need, Mr. Fowler, for the two issues?

21  Issues number one and two?

22            MR. FOWLER:  Ten pages.

23            THE COURT:  Ten pages?  Okay.

24       And then, Ms. Franklin, how long for the -- when

25  would the defendants like to file a response?

1          MS. FRANKLIN:  Judge, I will respectfully make

2   another pitch for setting a deadline that is shortly

3   after the motion to dismiss ruling because if we're

4   talking about having this motion now fully briefed in

5   late November, early December, I don't think that we're

6   getting things much more delayed than if we just waited

7   for the benefit of a motion to dismiss ruling and which I

8   think really is going to inform the parties' arguments on

9   both issues one and two.

10         I just I confirmed my recollection of the

11  scheduling order and we do have 90 days for the

12  substantial completion of document production following

13  the ruling on the motion to dismiss so I really -- you

14  know, I --

15         THE COURT:  I appreciate that, Ms. Franklin, but

16  I already said we're going to proceed with briefing on

17  this issue.

18         If you get a ruling on the motion to dismiss and I

19  haven't yet ruled the motion to compel, you all are

20  welcome to file a motion for leave to file a supplemental

21  brief that addresses the issue but I want to get ruling

22  on briefing on these issues.

23         And so what kind of time frame?

24         Maximum, what Mr. Fowler is asking for is three

25  weeks, so the latest I would be going is, say, November

1  27th.

2          MS. FRANKLIN:  I think that that is the day

3  before Thanksgiving, if I'm looking at my calendar

4  correctly.

5          THE COURT:  It is.

6          MS. FRANKLIN:  So if --

7          THE COURT:  We could move it up a day and

8  then --

9          MS. FRANKLIN:  I'm sorry?

10          THE COURT:  We could move it up a day and then

11  it's two days before Thanksgiving.

12          MS. FRANKLIN:  I will make the pitch that I

13  suspect my colleagues would like to ask for, which is to

14  push it to the following week, given the number of

15  parties and I know the number of clients and trial

16  schedules and travel and Thanksgiving, so not too press

17  my luck so far I would ask for December 3rd,

18  understanding that that may be longer than you'd like to

19  leave things.

20          THE COURT:  December 3rd it is.  Ten pages.

21          MS. FRANKLIN:  Alright.

22      Thank you, Your Honor.

23          THE COURT:  And then a response, or a reply,

24  Mr. Fowler, sometime maybe the following week?

25          MR. FOWLER:  Yes, that would be fine.

```
 1              THE COURT:  How about December -- let's say

 2   12th; three pages?

 3              MR. FOWLER:  That's fine.

 4              THE COURT:  Okay.

 5          And, Ms. Nommensen, how about the same schedule

 6   but on the motion for protective order?

 7              MS. NOMMENSEN:  Your Honor, Concord would

 8   request that we file our motion for protective order

 9   after the original motion to compel because it will hinge

10   on relevancy.

11          And so we'd like to see and participate in the

12   briefing before.  So if we could do -- file our motion

13   for protection December 20th.

14              THE COURT:  No.  No way I'm letting it go that

15   long, no.

16          How about the same briefing schedule?

17          And on that issue, since there's only one issue,

18   Ms. Nommansen, how about seven pages for opening briefs?

19          Does that work for you, Ms. Nommensen, and

20   Mr. Fowler?

21              MS. NOMMENSEN:  Yes, Your Honor.

22              MR. FOWLER:  Yes.

23              THE COURT:  And then two pages for the reply.

24          All right.  We'll get those issues -- get you all

25   off and running.
```

1          And if -- as I said, if you all -- if we get a

2     ruling from Judge Crabtree on that motion to dismiss

3     before I have issued a ruling, certainly you can file for

4     leave to file a supplemental brief, maybe meet and

5     confer, or even contact my chambers and say, Wait, wait,

6     wait, we think me we might be able to agree.

7          But in the meantime, I think we need to get

8     rolling on those issues and I'll just have to consider

9     the extent to which they may be informed by the motion to

10    dismiss.

11         And so, all right, with that, is there anything

12    further we need to take up today on plaintiffs?

13         Mr. Fowler?

14         MR. FOWLER:  Well, yes, Your Honor.

15    Just -- just to clarify, I identified earlier in my

16    statements that the parties have reached what we could

17    call the nonwaiver agreement, in the sense that our

18    requests for production included January and March 2021

19    data, and they also included requests related to what

20    I'll call profitability issues.  And so we -- we have

21    conferred about those, we have not reached an agreement.

22         In recognition of maybe trying to stage some of

23    this, we didn't present those issues today for the Court,

24    but I don't want to be in a position of having waived our

25    ability to bring those issues to the Court's attention,

1 say, after Judge Crabtree rules.

2       And so I just wanted to bring that to your

3 attention now.

4       Because if we need to file something to make sure

5 we can enforce those discovery requests, I'll want to do

6 that.

7       THE COURT:  No, given the type of -- I

8 appreciate that, Mr. Fowler.

9       And I will tell you that from my perspective I get

10 a lot tighter on that 30-day rule when we're up against

11 the close of discovery.  The rationale being if, you

12 know, if you're early on, you can always just re-serve

13 the discovery and re-tee up the despute and so if you all

14 are already, you know, meeting and conferring on that

15 issue but you think -- and particularly in these kinds of

16 cases where discovery is, to some degree staged, or at

17 least everyone's trying to front load what they believe

18 are the more important or time sensitive type documents,

19 I'm fine with that.

20       So no worries about that, but thanks for alerting

21 me.  You can tell me later if I forget, Oh, hey, you told

22 me that y'all I had tabled that issue for the time being

23 in the interest of getting some of these other issues

24 sorted out so I appreciate that, Mr. Fowler.

25       Okay, anything further today, Mr. Fowler?

```
 1            MR. FOWLER:  No.

 2            THE COURT:  Okay.  Anything further on behalf of

 3   the defendants, Ms. Franklin?

 4            MS. FRANKLIN:  No, Your Honor.

 5        Thank you for the time today.

 6            THE COURT:  Okay.  All right.

 7        Well, thank you for all of your time and I'll look

 8   forward to the riveting briefing, I'm sure, on behalf of

 9   so many defendants.  I'm sure that will be a joy to put

10   together.

11        And so, with all of that, the Court stands

12   adjourned.

13        Thank you, everyone.

14            MR. FOWLER:  Thank you.

15        (End of proceedings.)

16        ****************************************

17              C E R T I F I C A T E

18        I, Jana L. McKinney, certified shorthand reporter,

19   certify that the foregoing is a correct transcript from

20   the official electronic sound recording of the

21   proceedings in the above-entitled matter.

22        Dated this 29th day of October, 2024.

23

24              s/ Jana L. McKinney

25              Jana L. McKinney
                United States Court Reporter
```



1

2          I N D E X

                                                    PAGE

3

   REPORTER'S CERTIFICATE                             50

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25